**GENERAL MOTORS CORPORATION,**
Appellant,

v.

**E. Charles MENDICKI, Appellee.**

**No. 8365.**

United States Court of Appeals
Tenth Circuit.

Sept. 29, 1966.

Lucian Lane, Kansas City, Mo. (John Murphy, Kansas City, Mo., James J. Lysaught, Kansas City, Kan., Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, Mo., and McAnany, Van Cleave & Phillips, Kansas City, Kan., of counsel, on the brief), for appellant.

Bill E. Fabian, Kansas City, Kan. (Blake, Fabian & Fabian, Kansas City, Kan., of counsel, on the briefs), for appellee.

Douglas Stripp, Kansas City, Mo., Allan L. Bioff, and Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel, filed a brief as amicus curiae.

Before MURRAH, Chief Judge, and PHILLIPS and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Mendicki brought this action against General Motors Corporation to recover damages for an alleged slander. From a judgment on a jury verdict in favor of Mendicki, General Motors has appealed.

From the latter part of 1949, until April 3, 1963, Mendicki was employed by General Motors at its Buick-Oldsmobile-Pontiac Division Assembly Plant in Kansas City, Kansas, as a pipefitter.

At all times herein pertinent, Mendicki was a member of Local #31 of the International Union, United Automobile, Aircraft & Agricultural Implement Workers of America, AFL–CIO. The International Union will hereinafter be referred to as UAW.

On April 3, 1963, Mendicki was discharged by General Motors for alleged misappropriation of its property, in violation of its Shop Rules, which in part here pertinent provided:

"Violation of any of the following rules will be sufficient grounds for disciplinary action ranging from reprimand to immediate discharge, depending upon the seriousness of the offense in the judgment of management.

\*　\*　\*　\*　\*　\*

"28. Theft or misappropriation of property of employees or of the Company."

The alleged slander was predicated on a statement made by one of four representatives of General Motors at a grievance procedure meeting of such representatives and two representatives of UAW and two representatives of Local #31, held on August 20, 1963, for the purpose of attempting to adjust a grievance of Mendicki growing out of his discharge before it reached the fourth and last step in the grievance procedures provided for in the bargaining agreement of September 20, 1961, between General Motors and UAW, namely, a hearing on an appeal to an impartial Umpire, on behalf of Mendicki, the procedures provided for in the first three steps not having resulted in an adjustment of the grievance.

About 2:30 p. m. on April 3, 1963, Mendicki requisitioned 50 sheets of sandpaper and placed them in his personal clothes locker, where he kept his street clothes during working hours, his working clothes while off duty, and other personal effects. About 3 p. m. of that day, Dorsey F. Kent, a Labor Relations Representative for General Motors, received information from one of its employees, whose clothes locker was located near to Mendicki's, that Mendicki was going to remove some property of General Motors from the plant. Thereupon, acting under Kent's instruction, another General Motors employee in its Plant Protection Division intercepted Mendicki as he was on his way from the plant and took him to General Motors Labor Relations Office. When thus intercepted, Mendicki had part of such sandpaper in his trousers belt, which sandpaper was concealed from view by an all-weather coat he was wearing. Labor Relations employees charged with plant protection questioned Mendicki and investigated the matter, following which Mendicki was discharged. The facts disclosed by the questioning and the investigation, which were evidenced by testimony of employees of General Motors while testifying as witnesses for Mendicki, were sufficient to justify General Motors concluding that Mendicki intended to take the sandpaper from the plant and appropriate it to his personal use. However, the jury found that the statement on which the alleged slander was predicated was not true.

The established policy of General Motors throughout its plant for violation of Shop Rule 28, on April 3, 1963, and for a long period prior thereto, was to impose a mandatory discharge.

The Kansas City plant was shut down by a strike from September 18 to October 20, 1958. During that period a routine inspection of the plant was made by General Motors Plant Security personnel. In the course thereof, an unusual amount of property, including several types of hand soap, 36 pairs of gloves, a paint spray gun, and other mis-

cellaneous items, was discovered in a locked drawer in a work cart. Mendicki was known to use the cart and drawer and had a key to the drawer. He was suspended and an investigation followed. It disclosed facts giving General Motors good grounds for suspecting Mendicki was misappropriating General Motors property, but it could not be shown that Mendicki had exclusive use of the cart and drawer. Hence, the suspension was lifted and Mendicki was returned to work, with pay for the time he was under suspension. While the results of the investigation were not placed in Mendicki's personnel file and it showed that his record was clear, other records kept and preserved in the Labor Relations Department of General Motors and available to employees in that department fully reflected the results of such investigation.

The agreement between General Motors and UAW, in effect at all times here pertinent, provides a procedure for the adjustment of grievances of employees, consisting of four steps.[1]

In all grievance proceedings, the employee is represented by representatives of Local #31 or of UAW, who have complete and exclusive authority to act for him. The representatives of UAW have full authority to withdraw an appeal taken under Step Four, in behalf of the employee, to the impartial Umpire.

On April 3, 1963, and for many years prior thereto, it was the practice of UAW in grievance cases involving employees of General Motors, between the time the

---

1. The grievance procedure under Step One starts with the employee taking his grievance up with his foreman, who will then attempt to adjust it with the committeeman for the district where it arises. If an adjustment is not thus reached, it is reduced to writing and signed by the employee and a copy is given to the foreman. The committeeman may then take it up with higher supervisory representatives of General Motors in an effort to adjust the grievance. If adjustment is not reached by Step One, then Step Two procedure may be resorted to, during which the employee is represented by the local union shop committee and General Motors by the highest local management.

If the grievance is not settled by Step Two procedure, and the shop committee believes it has grounds for an appeal from the plant management decision, then pursuant to the procedure under Step Three, the shop committee prepares a statement setting forth all the facts and circumstances surrounding the grievance and the plant manager prepares a statement setting forth the management's reasons in support of its position. These statements are forwarded to the Regional Director of the UAW, who will decide whether the appeal shall be taken to the "Corporation and International Union." If he decides that the appeal shall be taken, then the matter is discussed and considered by representatives of UAW and of the local union in the plant involved and representatives of "local or divisional management" with a view to adjusting the grievance.

If no adjustment is reached, then the grievance may be appealed pursuant to Step Four by the Regional Director to an impartial Umpire by filing a notice of appeal and furnishing copies to the personnel staff of General Motors in Detroit and to UAW at its Detroit office.

The grievance procedure provides that after a case has been appealed to an impartial Umpire, the Director of the General Motors Department of UAW or a specified member of his staff will be granted permission to visit the plant for the purpose of investigating the specific grievance before it comes on for hearing before the Umpire.

Employees are not permitted to handle their own grievances. Either the local union or UAW has exclusive authority to represent them. In the processing of the grievances, pursuant to Steps One and Two, the employees are represented by the local union. In Steps Three and Four, they are represented by UAW. The employee whose grievance is under consideration is not permitted to be present at meetings between management and the representatives of UAW, held for the purpose of adjusting such grievances. The representatives of UAW have exclusive authority to decide either that the appeal to the impartial Umpire shall be prosecuted or shall be withdrawn. They also have exclusive authority in the processing of a grievance to agree to a settlement thereof with the representatives of management, and such an agreement is binding on the employee.

appeal was taken to the impartial Umpire and the time set for hearing of such appeal by the Umpire, to have its representative visit the plant where the grievance arose, investigate the grievance, and determine whether the appeal should be withdrawn, go on to a hearing before the Umpire, or be disposed of otherwise.[2] Since 1953, the function last mentioned has been carried out by a permanent Board of Review, consisting of four full-time International Representatives, three of whom constitute a quorum. See Arbitration and the Law, Alexander, pp. 125–128.

During the period between the taking of an appeal by the Regional Director to an impartial Umpire and the time set for the hearing of such appeal, at all times pertinent in the instant case and for many years prior thereto, it was standard practice, although not specifically provided for in the bargaining agreement, for representatives of UAW and Local #31 and representatives of General Motors to meet and discuss cases pending on appeal to the impartial Umpire and attempt to adjust the grievance. As a result of such conferences, many appeals are disposed of, either by adjustment or the withdrawal thereafter by the representatives of UAW.

Such screening procedures, carried out by UAW and by General Motors, and the efforts of representatives of UAW and of General Motors to adjust grievances pending on appeal, result in the disposition of a very large percentage of the appeals to the Umpire before the hearing stage is reached and only comparatively few are heard and determined by the Umpire. See Arbitration and the Law, Alexander, p. 129.

In the instant case, Mendicki started a grievance procedure under Step One. It was not adjusted under the procedures provided for in Steps One, Two and Three, and on July 1, 1963, the Regional

Director gave due notice of an appeal of Mendicki's grievance to an impartial Umpire.

Mr. Bolton, a Personnel employee of General Motors, while appearing as a witness for Mendicki, testified as follows:

At a meeting on August 20, 1963, Bolton, who was then Personnel Director, Mr. Roy Morter, a staff assistant of the Division Personnel Director of Central B–O–P Office in Detroit, Mr. Richard L. Hudson, a Supervisor of Labor Relations, Mr. Ardyth Blaise, a Labor Relations Representative, and Harold J. Fields, a Shift Supervisor of Labor Relations, were present and represented General Motors; Mr. Carl Stevens, International Representative for the Kansas City area of UAW and Mr. Ted Harson, also an International Representative, were present and represented UAW, and Mr. Carl Stinnett and Mr. Clifford Maxwell, employees at the Kansas City plant and members of Local #31, were present and represented the Local. The purpose of the meeting was to adjust grievance cases which had been appealed to the impartial Umpire, but had not yet reached a hearing stage, and to enable the UAW representatives to determine whether appeals which could not be adjusted should be withdrawn or prosecuted.

At a meeting held on August 15, 1963, members of the UAW Board of Review and Local #31 representatives discussed and considered 14 grievance cases, including the Mendicki case, which had been appealed to the impartial Umpire, but had not reached the hearing stage, and decided to take up all of such cases at the August 20, 1963 meeting referred to above, for the purpose of attempting to reach an adjustment of such cases.

The testimony as to what was said at the August 20, 1963 meeting, when Mendicki's case was under consideration,

2. General Motors also follows screening procedures when a case has been appealed to the Umpire, which embrace a complete investigation of the case by experienced personnel. If in the course of the in-vestigation such personnel conclude that a case should not be defended, local management is so advised and it attempts to arrange a settlement with UAW.

varies. Mr. Bolton, testifying as a witness for Mendicki, further stated that when the Mendicki case was reached, after some discussion, Mr. Harson said, "On the Mendicki case,—we understand that we have got a technical violation of this shop rule and we cannot win it in front of an umpire * * * but why won't you put him back to work anyway without back pay * * * and we can settle this case" and that he replied, "Mr. Harson, you have already answered your own question. You know * * * the penalty for this violation * * *. You know the penalty for this kind of case is proper. * * * Furthermore * * * this man has been involved in a similar incident once before, as a result of this we have suspected that he has taken things from us before." Hudson, Blaise and Fields, testifying for General Motors, fully corroborated Bolton's version of the conversation. Stinnett testified: "After a brief discussion * * * Harson * * * said 'What do you have against this fellow Mendicki?' and * * * Bolton * * * said, 'We know he has been taking stuff for years, but we've never been able to prove it until now.'" Stevens testified: "* * * frankly we were fishing for a settlement of the case" (Mendicki's case); that Harson opened up the discussion of the Mendicki case by saying to Bolton, "What do you have against Mendicki?" and Bolton replied, "We have knew that he was taking things out of the plant for some time, but we've never been able to pin it on him." It is clear that the statement was made in answer to a direct question asked by a representative of UAW and that the question and answer were an integral part of the bargaining process being carried on in an effort to adjust Mendicki's grievance and had direct relevancy to the issues involved.

The appeal of Mendicki's grievance to the impartial Umpire was not disposed of at the August 20, 1963 meeting, but on August 26, 1963, it was withdrawn in writing by a representative of UAW, duly authorized to take that action.

Bolton's statement that Mendicki had been under suspicion was no doubt based upon information he had received respecting Mendicki's reputation among the employees and disclosed by the investigation of the company property found in the drawer of the work cart in 1958.

There was uncontradicted proof that the representatives of General Motors present at the August 20, 1963 meeting never repeated to anyone the statements made by Bolton in response to Harson's question, and that the representatives of UAW and Local #31 present at such meeting did not repeat such statements to any other person than Mendicki.

█ It is our conclusion that statements made either by representatives of management or by representatives of an employee at a conference and bargaining session having for its purpose the adjustment of a grievance of the employee or other peaceable disposition of such grievance are unqualifiedly privileged.

The declared policy of the national legislation on labor relations is to encourage, facilitate and effectuate the settlement of issues between employers and employees through the "processes of conference and collective bargaining between employers and representatives of their employees," in order to promote and preserve industrial peace. (61 Stat. 152, 29 U.S.C.A. § 171.)

In Local 174, Teamsters, Chauffeurs, Warehousemen, etc. v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593, the court pointed out the importance of a single body of substantive law in the area embracing the adjustment of issues between employers and their employees by the peaceful process of conference and collective bargaining, and further said:

"* * * The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the

smooth functioning of that process thus strikes at the very core of federal labor policy."

If the representatives of either employer or employee were subject to an action for damages because of statements made of what they claimed to be the pertinent facts respecting a controversy under consideration and of their position respecting such matter and the reasons therefor, at a conference or collective bargaining session being held to adjust such controversy, the likelihood of the attainment of peaceful adjustments or disposition of the issues involved between them through the conference or bargaining processes would be greatly decreased.

The court, in Linn v. United Plant Guard Workers of America, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 recognized it was the Congressional intent that full, frank, uninhibited, robust, and wide-open debate between the representatives of the employer and employee in such conferences and bargaining sessions should be encouraged.

■ We think Congress intended that the respective representatives of employer and employee at such conferences and bargaining sessions should feel free to express their respective contentions as to the pertinent facts and the issues involved fully and frankly and to strongly support their positions with respect to the controversy, and—employing the words of Mr. Justice Fortas in his dissent in Linn—do so "untrammelled by fear of retribution for strong utterances." Otherwise, the chance for de-

sirable fruitfulness from such conferences and bargaining sessions would be greatly lessened. Moreover, such actions for damages would create irritations between employer and employee, which would tend to impair the chance for a peaceful settlement of labor controversies between employer and employee in the future.

■ In our opinion, the pronouncements and conclusions of the Supreme Court in the Linn case do not conflict with the views we have undertaken to express. That was a libel action for statements published in a union organizing campaign. They were not statements made, as here, in a conference or bargaining session to adjust or peaceably dispose of issues with respect to an employer's grievance. At most, they could only indirectly affect subsequent conferences or bargaining sessions to adjust or settle controversies between employer and employee. The Supreme Court recognized that Linn was a borderline case. It said if future "experience shows that a more complete curtailment, even a total one" is "necessary to prevent impairment of that policy" (national labor policy) the court would "be free to reconsider" its holding in the Linn case. The question in the Linn case was whether a libel action in the circumstances of that case "might interfere with the national labor policy." [3] The question in the instant case is whether an action for damages on account of the statement upon which the instant case is predicated, made in a conference and bargain-

---

3. In the Linn case the court said:
   "The question before us has been a recurring one in both state and federal tribunals, involving the extent to which the National Labor Relations Act, as amended, supersedes state law with respect to libels published during labor disputes. Its resolution entails accommodation of the federal interest in uniform regulation of labor relations with the traditional concern and responsibility of the State to protect its citizens against defamatory attacks. * * * Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable *per se*

in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language. Cafeteria Employees Union, etc. [Local 302] v. Angelos, 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58 (1943). *It is therefore necessary to determine whether libel actions in such circumstances might interfere with the national labor policy.*" (Italics ours.)

ing session to adjust an employer's grievance, and which was clearly germane to the issues involved, would interfere with the national labor policy, and whether it is necessary to hold such statements unqualifiedly privileged to prevent impairment of that policy. We conclude it is necessary to hold that the statement here involved was unqualifiedly privileged, in order to prevent impairment of that policy.

The judgment is reversed and the cause remanded, with instructions to dismiss the action with prejudice.