Saul E. JOFTES, Plaintiff,

v.

Rabbi Jay KAUFMAN, Defendant.

Saul E. JOFTES, Plaintiff,

v.

William A. WEXLER et al., Defendants.

Civ. A. Nos. 3271-67, 216-69.

United States District Court,
District of Columbia.

Jan. 15, 1971.

Byron N. Scott, Washington, D. C., for plaintiff.

Sheldon E. Bernstein, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

These two libel actions arise out of the circumstances surrounding the dismissal of plaintiff Saul Joftes from his position as an officer of B'nai B'rith, Inc. In Civil Action No. 3271-67, Joftes sues Rabbi Jay Kaufman, Executive Vice-President of B'nai B'rith, for allegedly libelous statements made in two letters of January 6 and February 20, 1967. In Civil Action No. 216-69, Joftes sues B'nai B'rith and its President, Dr. William A. Wexler, for similar statements made in a letter of February 14, 1968. Excessive discovery has been conducted in each case. Oral argument was heard on defendant's motion for summary judgment in 3271-67, and the parties were invited to submit affidavits concerning the extent of publication of the letters. Defendants in 216-69 have since also moved for summary judgment, and as the two cases arise on similar facts and involve common questions of law, the Court will deal with them in a single Memorandum.

Though the background of these cases is as complicated as might be expected where the precipitating event was a falling out among formerly close associates in an enterprise of international scope and political significance, the relevant facts may be briefly stated.

Saul Joftes was until January of 1967 the Director General of the B'nai B'rith International Council, working under Rabbi Kaufman and President Wexler, among others. In late 1966, Rabbi Kaufman, in consultation with other officers of the organization, decided for various reasons to terminate the employment of Joftes. When efforts to secure his resignation proved unsuccessful, Rabbi Kaufman informed Joftes that he was discharged, and dictated to his secretary a letter confirming this fact. The letter, dated January 6, 1967, stated that "The cause of your separation is your lack of capacity and competence to handle the position of Secretary-General," and detailed three general areas in which Joftes' superiors were dissatisfied with his performance. Accompanying this personal letter was a memorandum also addressed to Joftes, urging that he resign rather than accept involuntary dismissal.

Upon being handed this letter and memorandum, Joftes consulted with Albert Z. Elkes, President of the B'nai B'rith Headquarters Staff Association, a union of which Joftes was a member. Elkes communicated to the officers of the organization that Joftes had invoked the grievance procedures of the collective bargaining agreement, and requested a bill of particulars in support of the dismissal for cause. In the course of handling the Joftes matter, Rabbi Kaufman on February 20 dictated and sent to Joftes a "supplemental notice" of discharge, stating in part: "In addition to the causes for termination based on incompetence of a continuing nature as stated in the above letter, you are dismissed from employment on the further grounds of malfeasance, misfeasance and nonfeasance."

After this letter had been sent to Joftes, the parties again sought to resolve the dispute short of utilizing the grievance machinery, and in March of 1967 reached a seemingly acceptable compromise. Joftes was to continue his employment with B'nai B'rith in the position of Director of Research, at the same salary. The notice of discharge was rescinded, and the parties coexisted until December of 1967, when Joftes filed Civil Action 3271–67 against Rabbi Kaufman. This event precipitated Joftes' final discharge from the organization, which this time was communicated to him by President Wexler in a letter of January 5, 1968. Joftes shortly thereafter made a written demand upon Joseph Sklover, Comptroller of B'nai B'rith, for sums claiming to be due him under his contract. (This dispute later became the subject of Civil Action No. 2561–68 in which severance pay was awarded to Joftes and the award affirmed on appeal.) In response to this demand, Wexler dictated a letter dated February 14, 1968, which has become the subject of Civil Action 216–69. The allegedly libelous portion of this letter is as follows: "\* \* \* your dismissal dated January 5, 1968, was by reason of misconduct constituting 'malfeasance, misfeasance, and nonfeasance. \* \* \*' "

Affidavits submitted by defendants establish that Rabbi Kaufman's letters of January 6 and February 20, 1967, were published only to the following persons: Miss Edith Miller, Kaufman's secretary who typed the letters after they were dictated to her; President Wexler; Albert Elkes, President of the Staff Association; Maurice Weinstein, Chairman of the B'nai B'rith International Council and hence Joftes' immediate superior in the organization; Joseph Sklover, Comptroller of B'nai B'rith; and various attorneys associated with the firm which is counsel to defendant in these cases. President Wexler's letter of February 14, 1968, was published to these same persons with the exception of Elkes and Weinstein; and also to Mrs. Hannah Sinauer, secretary to Wexler, who was shown a copy to enable her to respond to a subpoena served upon her by Joftes in one of the lawsuits brought by him. This letter was also seen by plaintiff's wife, who opened the letter mailed to Joftes at his home address.

Central to the legal arguments of defendants is the collective bargaining agreement between B'nai B'rith and the Staff Association. Article VII of that agreement provides in part:

(1) A regular employee may be dismissed from employment only on the grounds of malfeasance, misfeasance, nonfeasance (including imcompetence of a continuing nature), or gross personal misconduct not connected with his official duties but of such a nature as to make his continuing employment a detriment to the purposes of B'nai B'rith.

(2) * * *

d. In all cases, the notice of dismissal or evaluation shall be in writing.

Article XVIII of the agreement establishes a grievance procedure by which an employee may contest his dismissal, provided he invokes the procedure within one week of his receipt of written notice of discharge.

■ Defendant contends that the existence of this agreement bars any action by Joftes based on the three letters in question. It is argued first that Joftes consented to the publication of each letter by virtue of his membership in the union whose agreement with B'nai B'rith required written notice of dismissal for cause; second, that under federal labor law the grievance procedure specified in the agreement is the exclusive remedy for any cause of action based on a notice of discharge; and finally, that the terms of the agreement

establish an absolute privilege for the issuance of each of the three letters.

All these arguments point in the direction of one principle: that notices of dismissal for cause which are contemplated by a collective bargaining agreement and which are published by the employer only to those with a legitimate interest in the subject matter may not be made the subject of an action in libel, regardless of whether the allegations of cause are true or false and regardless of the actual motive behind the dismissal.[1] This principle finds ample support in the law and requires that summary judgment be entered for defendants as to each cause of action.

That each of the documents at issue were contemplated by the collective bargaining agreement cannot be doubted. None of the letters made specific allegations or stated any causes for dismissal beyond the words stated in the agreement—i. e., "misconduct," "incompetence," or "malfeasance, misfeasance, and nonfeasance"—with the single exception of Rabbi Kaufman's letter of January 6, where the statement of cause in its entirety was as follows:

The cause of your separation is your lack of capacity and competence to handle the position of Secretary-General. The repeated requests of Mr. Weinstein to have ample communication with the members of the International Council through *The Courier* have not been met by you. We realize that you were unable to create this and other vehicles of communication

---

1. Although the possibility of malice is not precluded by the papers submitted in support of the motion for summary judgment (see Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed. 2d 142 (1970)), the Court notes that any evidence of malice is exceedingly slim. Discovery in these cases leaves little doubt that the source of difficulty between Joftes and the other officers of B'nai B'rith lay in disagreements over the organization's political activities, and that these differences led to Joftes' inability to work effectively with Rabbi Kaufman and others. The fact that these circumstances may not have been adequate cause for termination under the staff agreement does not establish the existence of malice in the notices of dismissal. Tending to show the absence of malice is the lack of any vituperation or wholly unfounded charges in the letters, and also the attempts of defendants to keep the dispute within the organization —attempts successfully frustrated by Joftes' conduct since the time of his discharge.

such as are regarded as indispensible [sic]. The desire for you to establish relations with the staff so that there would be a cooperative effort and a channeling of aid from the various commissions and committees into the overseas Districts was not undertaken [sic] by you, because of your inability to establish a rapport with members of the staff. Repeated requests for you to relate properly to the ADL personnel in order to set up a Human-Relations operation in South America were ignored by you and non-communicative and belligerent relations continued so that the entire endeavor had to be consummated without you.

Whether or not these claims of incompetence were just, and whether or not they were the true reasons for the discharge, each was directly related to Joftes' handling of his job and none went further than to state possible reasons for the employer's dissatisfaction with his performance.

Moreover, each letter was occasioned by a development relating to the dismissal. Rabbi Kaufman's January 6 letter was the official written notice of the 1967 discharge; his "supplemental notice" of February 20, adding "malfeasance, misfeasance, and nonfeasance" to the stated reasons for the dismissal, was written to clarify what appeared to be a breach of the agreement, since dismissals simply for "incompetence" had to be preceded by a written evaluation and an opportunity for the employee to improve his performance. President Wexler's letter of February 14, 1968, was written in response to a demand by Joftes for severance pay, and the recitation of cause for the dismissal was made because the reasons for discharge controlled the employee's entitlement to severance pay under Article XVII of the agreement.

Though the Court has found no precedent precisely in point, settled principles in the law of defamation support an absolute privilege for the letters in question. The publication even of a malicious libel is absolutely privileged if the person defamed consents thereto. Restatement of Torts § 583 (1938). In Comment (d) to § 583, the authors of the Restatement in discussing the law of absolute privilege draw attention to an analogous situation:

> Moreover, one who agrees to submit his conduct to investigation knowing that its results will be published, consents to the publication of the honest findings of the investigators. Such a consent may be derived from voluntary membership in an association, the rules of which provide for an investigation * * *.

By virtue of his membership in the Staff Association, Joftes had consented to a written statement of cause in the event of his dismissal. Whatever may be his remedies for an unjust dismissal, they certainly do not include an action in libel based on the letters announcing it.

To hold the contrary would bring the law of defamation into serious conflict with principles governing employment relations. In General Motors Corp. v. Mendicki, 367 F.2d 66 (10th Cir. 1966), the court held that the national labor policy protected statements made in the course of a grievance proceeding from being made the basis of a libel suit.

> It is our conclusion that statements made either by representatives of management or by representatives of an employee at a conference or bargaining session having for its purpose the adjustment of a grievance of the employee or other peaceable disposition of such grievance are unqualifiedly privileged. (367 F.2d at 70).[2]

This holding does not conflict with Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), where the Court held that the

---

2. To the extent that Henthorn v. Western Maryland Ry. Co., 226 Md. 499, 174 A.2d 175 (1961), holds that such statements are entitled only to a qualified privilege, it is in conflict with the better rule in the later Mendicki case.

Labor-Management Relations Act did not bar a defamation suit under state law by a company official against the union for statements made about him in the course of a union organizing campaign. The rationale of the Court's decision was that the remedial provisions of labor law offered no possibility of relief for the injury allegedly suffered by the official. 383 U.S. at 63, 86 S.Ct. 657. Here, on the other hand, Joftes had available to him an opportunity through the grievance machinery to secure personal relief and vindication, and by way of an action for wrongful discharge if the grievance procedure were held not to be an exclusive remedy under the terms of the agreement. To allow him to proceed instead by way of a burdensome, expensive, vexatious libel suit against individuals who did no more than fulfill their duty to inform him of reasons for his discharge would indeed be subversive of the carefully constructed system of procedures and remedies for employment disputes. *See* Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), where in deciding that a failure to utilize a contractual grievance procedure to contest an involuntary dismissal barred the employee from maintaining a lawsuit for wrongful discharge, the Court noted:

> A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. (379 U.S. at 653, 85 S.Ct. at 616–617)

■ The grounds for the privilege, of course, do not exist where the employer publishes the notice containing the grounds for dismissal to persons without a legitimate job-related interest in receiving it. There was no such excessive publication in these cases. It requires no discussion to hold that all recipients of each letter were within the scope of its justified distribution, with the exception of Joftes' wife who saw Wexler's letter through no fault of defendants.

Plaintiff asserts that there is a genuine issue of fact as to whether others may have seen one or more of the letters, but he has offered no proof, by way of affidavit or otherwise, to contradict defendants' unqualified denials. None of plaintiff's other asserted "genuine issues" are material in these cases.

Defendants' Motion for a Protective Order in Civil Action 216–69 is denied. The foregoing Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law. Counsel shall submit orders within one week granting summary judgment for all defendants in both cases.