**LOUISVILLE AND NASHVILLE RAILROAD COMPANY and Charles G. Scott, Appellants,**

v.

**Herman Joseph MARSHALL, Appellee.**

Court of Appeals of Kentucky.

April 6, 1979.

Discretionary Review Denied Oct. 2, 1979.

John P. Sandidge, Woodward, Hobson & Fulton, Louisville, for appellants; M. D. Jones, Chauncey E. Brummer, Law Dept., Louisville, of counsel.

James M. Clements, James W. Bryant, Schaefer & Airhart, Louisville, for appellee.

Before GANT, WHITE and WILHOIT, JJ.

GANT, Judge.

Appellee Marshall is an employee of appellant L & N and a member of the Brotherhood of Railway, Airline and Steamship Clerks (BRAC), which organization has a collective bargaining agreement with L & N. Marshall's seniority dates back to 1966, when he commenced work with the L & N as a clerk-typist. He worked in various positions covered by the agreement and in one exempted position for a period of several years, and participated in the company's educational program by which they paid his college tuition leading to a B. S. degree. In February, 1975, after an exempted position had been abolished, Marshall exercised his seniority under the collective bargaining agreement to claim a position in Capital Expenditures Accounting and was awarded the position of Additions and Betterment (A & B) Accountant-Knoxville Division. One year later, another position opened up in the A & B section in Special Projects and appellant again exercised his seniority under the collective bargaining agreement, bid for this position and was awarded it commencing March 8, 1976.

Under the collective bargaining agreement, an employee holding a new position is placed on a 30-day probationary period, which could be extended to 90 days with the consent of the union. Appellee's immediate supervisor, appellant Charles G. Scott, because appellant had taken five days vacation and three days sick leave in the first three weeks, sought and obtained an extension of the qualifying period for the maximum of 90 working days and Marshall was so notified.

Marshall took another vacation on April 12 to noon April 15, took a half day off without pay for the remainder of April 15 and April 16 was a holiday—Good Friday. Thus, in the first 30 work days, Marshall had taken 8½ days vacation, three days sick leave, one-half day off without pay and a holiday. Scott, knowing that he would be out of the office on business for the week commencing April 19, went through the work papers which had accumulated on Marshall's desk during his previous week's absence, organized these papers and prepared a handwritten memorandum of instructions. Scott left Xerox copies of these instructions for his immediate superior, the person in charge of the section in his absence, and with a co-worker of Marshall's, and phoned Marshall at home informing him of the instructions and the manner in which he could get help. During the next week, when Marshall was to do this work, he took another day of sick leave and a day off without pay, working only three days, and completed only two of the eight items of work assigned to him. It was the consensus of the proof in this case that the work assignment given by Scott to Marshall was not an onerous burden and that the work could have been done in the work period.

Scott himself was scheduled for two and one-half days vacation commencing at noon on April 28 and before leaving the office discussed some 40 reports which Marshall had logged out and which Scott informed him were of number one priority. On Scott's return to the office on May 4, he found that Marshall had accumulated some 93 material reports on the special projects job. Marshall had not worked on May 3 or May 4 because of the death of his stepfather, but it was determined that 68 of these 93 reports were received on April 27 or before, four received on April 28 and 12 received on April 29. Of course, no discredit was assigned to Marshall for those which were received during his absence for his stepfather's funeral. Again, the proof indicated that the work was not burdensome and could have been done in the work period without undue hardship.

During the period already referred to, two memoranda concerning Marshall were prepared by Mr. Scott. The first of these stated, in part, as follows:

Joe has demonstrated that he is an intelligent person with a good educational background and holds college degrees in various fields. He is presently a student at the University of Louisville Law School during the evenings. However, he is an immensely involved person with business and political activities in addition to handling his school work and his position with the railroad.

In his previous position, Joe used the phones excessively from my viewpoint. This matter was discussed with Joe previously and again after assuming his new position but has not been resolved to my complete satisfaction.

There is no doubt but what Joe has the ability to learn the duties of his new position if he will concentrate on his work and use his time properly. He cannot qualify in this position without concentration and dedication and does not have the time for excessive involvement in matters not related to company business.

This memorandum was prepared on April 24, given to Scott's secretary on April 26 and dated April 28.

The second memorandum, which Marshall claims is in part libelous, was dated May 5 and reads as follows:

Upon returning from vacation on May 4, 1976, and reviewing the status of track material accounting which was scheduled to close at 2:00 P.M. that day, I discover-

ed that all A&B accountants had progressed to the point where they could close the material audit on schedule except for Mr. H. J. Marshall.

Our track material log-out sheet reflected that only two lots (40 reports) had been worked and turned over on the Georgia Railroad for handling by our Data Processing Department. These two lots had been turned over by Joe Marshall before I left on vacation on Wednesday, April 28, 1976. Before I left on vacation, I specifically instructed Joe to give priority to working track material reports up to date.

Joe was not present for work when I returned due to the death of his stepfather, and had been absent the previous day for that reason. I reviewed Joe's track material reports which had been received but not worked—a breakdown of these reports is shown below:

| | |
|---|---|
| Georgia Railroad | 12 |
| A&WP Railroad | 9 |
| WRofA Railroad | 17 |
| C&EI Sub Division | 55 |
| Total Reports Not Worked | 93 |

A review of the date received stamp on the back of these reports indicated that six (6) reports were received the morning of May 4th, and the remaining eighty seven (87) reports were received on April 29th or prior.

I confirmed that Joe Marshall had worked Wednesday through Friday, April 28–30, a total of twenty hours since my departure although no accomplishments of any consequence were evident. However, I understand he spent about two hours within that period discussing with Mr. Spencer a memo by Mr. Booth regarding excessive use of the telephones.

It is evident that within the remaining eighteen (18) hours, Joe had sufficient time to work the material reports up to date, but willfully chose to ignore my directive. I suggested to Joe that if he had any questions regarding material reports during my absence, he should talk with Acting Supervisor D. R. Kellum or Bob Skeeters, the previous occupant of

his position. I have confirmed that no questions regarding track material were asked of either party.

As a matter of information, a total of sixteen (16) additional hours were required by other A&B accountants and by me personally to close out Joe's material audit while shelving our own duties. This was accomplished at 4:00 P.M. instead of meeting the 2:00 P.M. deadline.

As a matter of record, I want to cite a similar situation discovered on April 26, 1976, upon my return from Atlanta. I spent the week of April 19–23 in Atlanta on an inventory of the Georgia Railroads. Before leaving, I reviewed the work on Joe's job while he was on vacation and made a list of work required to catch up his work in the sequence which I wanted it performed. This list was left with Acting Supervisor Kellum for handling with Joe. In addition, I called Joe at home on Sunday evening, April 18th, and discussed the list of work items with him. When I returned, I found Joe had been sick one day and had been given another day off without pay. In the 24 hours he worked that week, he acknowledged that he had only completed the first two items on the list of eight items, both of which dealt with filing reports and correspondence.

Both situations were discussed with Mr. J. W. Booth and Mr. P. L. Spencer. The first situation mentioned regarding the material reports was also discussed with Mr. M. S. Coffman, Local Chairman of the B.R.A.C. Protective Committee, and the unworked reports were shown to him.

Joe's actions in both instances show a disregard for directives both written and verbal, and indicate that he had no intention of complying with requests made of him or subordinating himself to established supervision. These actions alone seem to be sufficient grounds for disqualification from this position.

After considerable discussion with Mr. Spencer about this matter, he requested that Mr. Booth and I confer with Joe Marshall about these incidents, determine

his response to them, and outline anew what is expected of him in this position. Additional time was to be granted him to give him every chance to qualify in this position rather than invoke disqualification procedures at this time.

A pencilled copy of this was furnished to Scott's immediate supervisor and prepared by a secretary in the office.

Also, during the period of time to this point, Scott's immediate superior had noted that a number of the employees in Marshall's section were making excessive use of the telephone in the office and had prepared a memorandum reminding the employees of the existing office rules concerning the use of the single telephone in that section. All the employees in this section initialed the memorandum except for Marshall who refused on the grounds that he did not agree with the memorandum. This matter was referred to another supervisor in the office, who had a two-hour meeting with Marshall, resulting in Marshall's initialing the memorandum despite his disagreement. Apparently after this conference, Marshall took off another two hours and ten minutes without pay.

At some point after the May 5 memorandum, above referred to, a conference was held between Marshall and his two immediate supervisors, including Scott, encouraging Marshall to work harder during his probationary period, which conference did not result in material satisfaction to the supervisors. An itemized list of errors attributable to Marshall was kept and referred to him for corrections, and on Saturday, August 7, 1976, Scott prepared a handwritten memorandum to the company in which he set forth his recommendations concerning the qualifications of Marshall for the position on which he was serving the probationary period. This was given to an office secretary to type, which was prepared on August 9 and dated August 10. On August 9 a copy of this was given to Marshall, as well as a copy of the May 5 memorandum. This latter memorandum is as follows:

You have requested that I give you my final evaluation of Mr. H. J. Marshall on the Special Projects Accountant's position. The qualification period on this position expires on August 17, 1976.

The position of Special Projects Accountant is one of two top rated positions in the A&B Section. Both higher rated positions have traditionally been positions of leadership within the section and have been held by our most experienced personnel. Likewise, these positions have been utilized as assistants to the supervisor in carrying out the duties of the department.

Joe Marshall rejoined our office staff in February, 1975, when his personal office position in the Tax Department was abolished. After an absence of approximately seven years, he had to be completely retrained in A&B accounting procedures. He worked for approximately twelve months as the A&B Accountant on the Knoxville Division before bidding on the Special Projects Accountant position. Mr. Marshall, although retaining office seniority from previous employment, is the least experienced of the A&B Section personnel.

I have instructed and closely supervised Joe in the duties of his new position for five audit periods (March–July 1976) as well as the respective post audit periods. My observations and evaluations are as indicated below:

(1) Education, Aptitude and Motivation —Joe, as previously mentioned, has a good educational background holding degrees in various fields, none of which are in accounting. He is a likeable person and possesses qualities which in my opinion would be beneficial in public relations and the law fields to name a few. However, in my opinion, he does not have the proper aptitude for accounting work which requires minute detail and does not have motivation in this area.

(2) Experience—He does not have sufficient experience to perform satisfactorily in the position he is now working. Many questions he asks of junior employees in order to perform his work

rather than being the experienced leader who can give directions to them. (3) Interest and Initiative—The Special Projects Accountant's position requires someone who is interested in the work and is capable of performing the duties of the position individually and with a minimum of direction and supervision. Although Joe showed an interest initially in learning the duties, he more recently has not demonstrated that he is individually oriented or could be classified as a self starter or organized. Too often, he depends upon the supervisor to plan his daily activities and determine the things required to be done.

(4) Performance—I feel that during the time Joe has held this position, he has been given the necessary instructions and assistance from me personally and others whom I have assigned to help him to learn many of the duties of the position and the proper work environment from which satisfactory progress should be evidenced. However, from an evaluation standpoint, I feel he has not performed satisfactory [sic]. He still asks simple questions about matters that have been covered previously and have been repeated but apparently he does not remember the answers. He is a slow worker and commits numerous errors which are a matter of carelessness or improper concentration. Likewise, as has been pointed out in prior communications regarding two specific instances, he does not perform well in the absence of direct supervision and has ignored verbal and written directives which were to be performed during the supervisor's absences.

(5) Morale—In order to perform the duties of the Special Projects Accountant since Joe has been working this position, I have called on other employees to assist in some areas in critical times such as audit closes and this is resented by these employees. This sentiment has been observed by me and has been expressed to the B.R.A.C. Local Chairmen and through him to Mr. Booth and me.

In conclusion, I feel that Mr. Marshall has not performed in a satisfactory manner in the position of Special Projects Accountant and I recommend that disqualification procedures be effected.

After considerable discussion between the supervisors, several alternatives to formal disqualification were suggested to Marshall, none of which was acceptable to Marshall. On August 16 Marshall was officially notified of his disqualification as A & B Accountant—Special Projects and of his return to his former position of A & B Accountant—Knoxville Division, effective August 18, 1976. Rather than return to the Knoxville Division, Marshall exercised his seniority, bid for and was awarded the position of A & B Accountant-Cincinnati Division, a position comparable to the Knoxville job. This job paid some $60.00 per month less than the job from which Marshall was disqualified.

Thereafter, Marshall requested a hearing, pursuant to the collective bargaining agreement, on his grievance against the company. In this request, he asked for participation by his retained counsel. The agreement itself provided for a hearing before a designated company officer and provided for representation of the employee by union representatives, but the agreement did not provide for either the company or the employee to be represented by counsel. The agreement further provided for an appeal to the National Railway Adjustment Board as provided in the Railway Labor Act, after a decision by the company. At the outset of his request for a hearing, Marshall sought the assistance of the officials of the union, BRAC, and requested a hearing within ten days as provided by one section of the collective bargaining agreement. However, the company construed the hearing to be under another section of the agreement, which section seems to this Court to be applicable, and which section had no ten-day provision. A satisfactory date was worked out between the company and the union officials, each side having a

conflict on the dates first sought, and a hearing was set for September 21, 1976, some three weeks after the request for a hearing had been granted. The appellee apparently became disenchanted with union representation, insisted on his hearing under the inapplicable ten-day provision and finally obtained a restraining order against the company to prevent the hearing he had originally requested. Thus, instead of pursuing the process established by the agreement, the appellee actually prevented the process.

Marshall brought this action in the Jefferson Circuit Court, alleging that he was libelled by the L & N and Scott, his supervisor, and the jury awarded him damages in the amount of $120,000, $60,000 compensatory and $60,000 punitive.

Appellants first argue that the Railway Labor Act provides a complete and exclusive remedy for the resolution of all minor disputes between a carrier and its employees arising out of the employment relationship established to a collective bargaining agreement negotiated pursuant to that Act. The applicable section of the Railway Labor Act, 45 *U.S.C.* § 153 First (i) reads as follows:

> The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment, in this manner the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

Thus, two steps for a grievance are set up, just as appeared in the collective bargaining agreement herein. First, the designated officer of the company hears the grievance, and second, the Adjustment Board serves as the appellate body. It is uncontradicted that Marshall availed himself of neither of these procedures, and the sole question then becomes whether this is an exclusive remedy or whether the state courts retain their right in this type of case to grant relief for an alleged malicious and intentional libel.

At first reading, 45 *U.S.C.* § 153 First (i), seems to be an optional provision when relating to the Adjustment Board in that it states that ". : . the disputes *may* be referred . . . to the appropriate division of the Adjustment Board." Indeed it was so held in the case of *Moore v. Illinois Central R. Co.,* 312 U.S. 360, 61 S.Ct. 754, 85 L.Ed. 1089 (1941). However, since that decision the Supreme Court has repudiated that ruling on numerous occasions. In the case of *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 39, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957), the court, after reviewing the legislative history of the Railway Labor Act, stated:

> This record is convincing that there was [a] general understanding between both the supporters and the opponents of the 1934 amendment that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field.

In the case of *Walker v. Southern Railway Co.,* 385 U.S. 196, 198, 87 S.Ct. 365, 366, 17 L.Ed.2d 294 (1966), the court said:

> Provisions for arbitration of a discharge grievance, a minor dispute, is not a matter of voluntary agreement under the Railway Labor Act; the Act compels the parties to arbitrate minor disputes before the National Railroad Adjustment Board established under the Act.

The case of *Andrews v. Louisville & Nashville Co.,* 406 U.S. 320, 322–324, 92 S.Ct. 1562, 1564–1565, 32 L.Ed.2d 95 (1972), went even further in disposing of *Moore.* The court in this case stated:

> Thus, the notion that the grievance and arbitration procedures provided for minor disputes in the Railway Labor Act are optional, to be availed of as the employee

or the carrier chooses, was never good history and is no longer good law.

.    .    .    .    .

In *International Association of Machinists v. Central Airlines,* 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963), an agreement required under § 204 of the Railway Labor Act was said to be "like the Labor Management Relations Act § 301 contract . . . a federal contract and . . . therefore governed and enforceable by federal law, in the federal courts.

.    .    .    .    .

The fact that petitioner characterizes his claim as one for "wrongful discharge" does not save it from the Act's mandatory provisions for the processing of grievances. Petitioner argues that his election to sever his connection with the employer and treat the latter's alleged breach of the employment contract as a ["single"] "discharge" renders his claim sufficiently different from the normal disputes over the interpretation of a collective bargaining agreement to warrant carving out an exception to the otherwise mandatory rule for the submission of disputes to the Board. But the very concept of "wrongful discharge" implies some sort of statutory or contractual standard that modifies the traditional common-law rule that a contract of employment is terminable by either party at will. Here it is conceded by all that the only source of petitioner's right not to be discharged, and therefore to treat an alleged discharge as a "wrongful" one that entitles him to damages, is the collective-bargaining agreement between the employer and the union.

It is our opinion that these cases, above cited, are dispositive of this case and that the Railway Labor Act and the collective bargaining agreement herein provide for a sole and exclusive remedy by the procedures above outlined. The appellee urges that the federal law does not apply and cites numerous cases in support thereof, principally the case of *Linn v. United Plant Guard Workers of America,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). This case

was also a defamation action and was brought under state law against a union. However, the remarks in this case were made during the course of a union organizing campaign and not made pursuant to a contract and collective bargaining agreement which had been negotiated pursuant to the Railway Labor Act and which agreement itself adopted the provisions of that Act and provided for the resolution of minor grievances.

■■■ The common law rule has always been that a contract of employment is terminable by either party at will, in the absence of some statutory or contractual standard that modifies this rule. In the instant case, Marshall secured his employment under the collective bargaining agreement mandated by the Railway Labor Act. It was his seniority as prescribed by that Act and by the collective bargaining agreement which had secured this job, as well as several other jobs held by the appellee. In the absence of the collective bargaining agreement and the Railway Labor Act, Marshall could have been demoted or even discharged with no excuses given. The standards prescribed for a qualifying or probationary period were the result of the collective bargaining agreement. That agreement further provided for an evaluation by the supervisor of the employee and his performance during the probationary period. It is difficult for this Court to see why the federal law does not apply, and it is our opinion, pursuant to the cases above cited, that the Railway Labor Act clearly provides for a complete and exclusive remedy for the resolution of such a minor dispute as the demotion of an employee who holds his position pursuant to a collective bargaining agreement under that Act.

■■■ Appellee urges that the "outrageous conduct" of appellants removes this case from the exclusivity of the Railway Labor Act. This phrase is apparently gleaned from the case of *Farmer v. United Brotherhood of Carpenters and Joiners of America, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). That case concerned

violence and threats of violence among union members over hiring hall practices, and was not an action rooted in contract. However, *Farmer* gives to us an insight into the type of cases where the federally prescribed remedy is exclusive and those in which the state law will apply. Although dealing with the Labor Management Relations Act and not the Act here in question, the court referred to the rule which has become known as the *Garmon* rule as elucidated in the case of *San Diego Building Trades Council Etc. v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), as follows:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.

*Farmer* then goes on to recognize a number of exceptions, citing *Linn v. Plant Guard Workers, supra. Farmer* noted the limitations of *Linn,* one being that an exception to the *Garmon* rule would be granted where there would be little risk that the state cause of action would interfere with the effective administration of national labor policy. *Farmer, supra* at 97 S.Ct. 1062. We can imagine nothing which could interfere to a greater extent than stifling the policy of rating of probationary employees by their supervisors because of fear of a state action for libel. As the court said in *Macy v. Trans World Airlines,* 381 F.Supp. 142, 148 (D.Md.1974):

> Notices of suspension and dismissal for cause, which are contemplated by the Collective Bargaining Agreement for adjustment and arbitration pursuant to the Railway Labor Act, must be allowed to be made clearly and precisely in accordance with the policies of the Railway Labor Act and must not be allowed to be

subject to the temptation of ambiguity or imprecision by one fearful of a libel action under state law.

The "outrageous conduct" complained of in the instant case pales when the definition of such conduct as outlined in *Farmer* is applied. That definition is: "It must be of such a substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Id.* at 97 S.Ct. 1060.

The conduct herein falls far short of that standard.

The second argument of the appellant is that statements made by a supervisor of the carrier in connection with the work performance and behavior at work of an employee directly under his supervision, which statements are made pursuant to procedures contemplated by the collective bargaining agreement, are clothed by federal law with an absolute privilege. This argument is virtually concurrent with the other argument advanced by the appellant and discussed above.

Again, several federal cases furnish us with the guidelines for this. We feel that the language in the case of *Joftes v. Kaufman,* 324 F.Supp. 660, 662 (D.D.C.1971), sums up the position of the courts under these circumstances. In that case the court held:

> All these arguments point in the direction of one principle: That notices of dismissal for cause which are contemplated by a collective bargaining agreement and which are published by the employer only to those with a legitimate interest in the subject matter may not be made the subject of an action in libel, regardless of whether the allegations of cause are true or false and regardless of the actual motive behind the dismissal. This principle finds ample support in the law and requires that summary judgment be entered for defendants as to each cause of action.

In the instant case, the only publication of this report was to the secretary who typed the reports and to those supervisory

employees with a "legitimate interest in the subject matter." It is also clear that under the collective bargaining agreement which provided for the probationary period, a report from the immediate superior to that person in charge of making permanent appointments was contemplated.

The court in *Joftes, supra* at 664, went on to say:

Here, on the other hand, Joftes had available to him an opportunity through the grievance machinery to secure personal relief and vindication, and by way of an action for wrongful discharge if the grievance procedure were held not to be an exclusive remedy under the terms of the agreement. To allow him to proceed instead by way of a burdensome, expensive, vexatious libel suit against individuals who did no more than fulfill their duty to inform him of [the] reasons for his discharge would indeed be subversive of the carefully constructed system of procedures and remedies for employment disputes.

In the case of *General Motors Corp. v. Mendicki*, 367 F.2d 66, 70–72 (10th Cir. 1966), the court stated as follows:

It is our conclusion that statements made either by representatives of management or by representatives of an employee at a conference and bargaining session having for its purpose the adjustment of a grievance of the employee or other peaceable disposition of such grievance are unqualifiedly privileged.

. . . . .

The question in the instant case is whether an action for damages on account of the statement upon which the instant case is predicated, made in a conference and bargaining session to adjust an employer's grievance, and which was clearly germane to the issues involved, would interfere with the national labor policy, and whether it is necessary to hold such statements unqualifiedly privileged to prevent impairment of that policy. We conclude it is necessary to hold that the statement here involved was unqualifiedly privileged, in order to prevent impairment of that policy.

In the *Mendicki* case, *supra,* the alleged defamation occurred in a session similar to Step 1 in the grievance procedure provided under the collective bargaining agreement in this case and under the Railway Labor Act. We feel that this is indistinguishable from the procedure provided under that Act for the probation of an employee before permanent acquisition of the position which he sought under this collective bargaining agreement.

Appellee urges again that the case of *Linn v. United Plant Guard Workers, supra,* would remove actual malice from the exemption. However, both the *Joftes* case, *supra,* and *Mendicki, supra,* distinguish *Linn* by stating that the remarks made in that case occurred during the course of a union organizing campaign and did not occur pursuant to the collective bargaining agreement itself and pursuant to the Railway Labor Act, which provided a means of settling such minor grievances.

■ Appellee contends that *Joftes v. Kaufman, supra,* does not apply because of the element of consent by the employee which was present in that case. However, the consent therein was implied from the fact that the collective bargaining agreement entered into between the employer and the union of which the employee was a member required written notice of reasons for dismissal. In the case before us, written notice was not required, but we feel that it was clearly contemplated by the collective bargaining agreement as a part of the probationary process. Indeed, the Railway Labor Act, 45 *U.S.C.* § 153, First (i), provides for a "full statement of facts . . . bearing upon the disputes." The appellee, having secured positions with his company for a period of ten years under the provisions of the Act, cannot accept the benefits and then claim inapplicability of the provisions he does not like. We feel that the same element of implied consent to the report is present herein.

■ We therefore hold that under the circumstances of this case the communica-

tions complained of as libelous by the appellee were, in fact, privileged communications and clearly contemplated under the terms of the collective bargaining agreement.

In view of our holdings on the two previous grounds, it is not necessary for us to reflect upon the other arguments of the appellant. However, we do note that the evidence of actual malice was extremely veiled and hardly clear and unequivocal as required under the case law. It is our further opinion that reference to the appellee as an intelligent person but lacking in interest and motivation may well have been true in light of the fact that he operated a real estate office with four salesmen, operated as an auctioneer, and was attending law school in addition to working for the appellant, L & N.

For the reasons above stated, the judgment herein is reversed.

All concur.