482 A.2d 266

**Marlin U. ZARTMAN, Appellant,**

**v.**

**LEHIGH COUNTY HUMANE SOCIETY, Jane Schramm, Mary Ann Faye, and John Kauffeld.**

Superior Court of Pennsylvania.

Argued Sept. 6, 1983.

Filed Sept. 14, 1984.

246

Dennis L. O'Connell, Gilbertsville, for appellant.

Donald B. Pritchard, Jr., Norristown, for Lehigh County, appellee.

Malcolm J. Gross, Allentown, for Faye, appellee.

Before ROWLEY, POPOVICH and MONTGOMERY, JJ.

MONTGOMERY, Judge:

Plaintiff-appellant, Marlin Zartman, appeals from an order sustaining defendants-appellees' preliminary objections in the nature of a demurrer and dismissing his complaint. For the reasons stated herein, we reverse the order and remand for further proceedings.

On June 1, 1982, appellant, the owner and operator of the Gilbertsville Sales Stables Livestock Auction at Zern's Market in Montgomery County, filed a complaint in trespass against the Lehigh County Humane Society (Society), Jane Schramm, Mary Ann Faye and John Kauffeld. Comprised of seven counts, the complaint averred that the defendants had defamed Zartman, invaded his privacy, intentionally and maliciously interfered in his business relationships, and

unlawfully conspired to further these objectives. These allegations stemmed from two newspaper articles, "Where an animal's fate is determined by the highest bid,"[1] published on February 24, 1982, in *The Morning Call*, an Allentown daily newspaper, and "A Life Devoted to Saving Dogs and Cats," printed in the April 25, 1982, edition of *The Philadelphia Inquirer.*

Defendant Kauffeld filed an answer which contained new matter. Thus, appellant's action against Kauffeld was not part of the order here on appeal. In addition, appellant has abandoned his conspiracy claim on appeal. We are not therefore concerned with the *Inquirer* article which is relevant only to the conspiracy claim and to the claim against Kauffeld.

The remaining defendants filed preliminary objections, including several which were in the nature of a demurrer, asserting that those portions of the *Morning Call* article characterized by appellant as libelous were incapable of a defamatory meaning.[2] The Honorable Richard S. Lowe agreed, sustained the preliminary objections in the nature of a demurrer, and dismissed the complaint as to the Society, Schramm and Faye. This appeal followed.

■ Adjudication of a defamation action in Pennsylvania involves, initially, consideration of § 8343(a) of the Judicial Code, 42 Pa.C.S. § 8343:

§ 8343 *Burden of Proof*

(a) Burden of plaintiff.—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

---

1. This article was written by appellee Faye.

2. Appellees' other preliminary objections included motions for a more specific pleading, a motion to strike and an assertion of privilege. The complaint was dismissed solely on the issue of defamatory meaning and only that issue was treated by the court. Therefore, that is the only issue before us.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

Procedurally, it is the trial court's function to determine, in the first instance, whether the communication complained of is capable of a defamatory meaning. *Rutt v. Bethlehems' Globe Publishing Co.,* — Pa.Super. —, 484 A.2d 72 (1984); *Rybas v. Wapner,* 311 Pa.Super. 50, 457 A.2d 108 (1983). If the court determines that it is capable of a defamatory meaning, it then becomes the jury's function to decide whether the communication was so understood by its recipients. *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (1971); *Braig v. Field Communications,* 310 Pa.Super. 569, 574 n. 2, 456 A.2d 1366, 1369 n. 2 (1983); *Dunlap v. Philadelphia Newspapers, Inc.,* 301 Pa. Super. 475, 482, 448 A.2d 6, 10 (1982).

■■■ A statement is defamatory if it tends to harm an individual's reputation so as to lower him in the estimation of the community or deter third persons from associating or dealing with him. *Corabi v. Curtis Publishing Co.,* 441 Pa., at 442, 273 A.2d at 904; *Rybas v. Wapner,* 311 Pa.Super., at 54, 457 A.2d at 110. As one leading authority has stated,

Defamation is ... that which tends to injure "reputation" in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him. It necessarily, however, involves the idea of disgrace ...

Prosser, *Law of Torts,* 4th Ed., Sec. 111, p. 739, quoted with approval in *Vitteck v. Washington Broadcasting Co.,* 256 Pa.Super. 427, 432, 389 A.2d 1197, 1200 (1978).

In determining whether a newspaper article, for example, is defamatory, the trial court must decide whether it can

reasonably be construed to have the libelous meaning ascribed to it by the complaining party. *Corabi v. Curtis Publishing Co., supra; Rutt v. Bethlehems' Globe Publishing Co., supra.* As such, the work must be construed in its entirety. *Rutt v. Bethlehems' Globe Publishing Co., supra; Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa. Super. 588, 422 A.2d 625 (1980).

> The test is the effect the [entire] article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same significance that other people are likely to attribute to them.

*Corabi v. Curtis Publishing Co.,* 441 Pa., at 447, 273 A.2d at 907, quoting *Boyer v. Pitt Publishing Co.,* 324 Pa. 154, 157, 188 A. 203, 204 (1936).

▆▆▆ The issue in this case is whether the *Morning Call* article is capable of a defamatory meaning.[3] In assessing this claim, we first observe that

> [W]hen considering preliminary objections in the nature of a demurrer, we accept as true all well-pleaded material facts in the complaint, as well as all inferences reasonably deducible therefrom ... [P]reliminary objections should be sustained and a complaint dismissed only in cases that are clear and free from doubt, i.e., it must appear with certainty that, upon the facts averred, the law will not permit recovery by the Plaintiff.

*Bickell v. Stein,* 291 Pa.Super. 145, 149, 435 A.2d 610, 612 (1981), quoting *Donnelly v. DeBourke,* 280 Pa.Super. 486,

---

**3.** Appellant incorporated the entire article into his complaint and pointed out specific examples of what he considered to be defamatory statements. He argues that the article, as a whole, defames him. We believe appellant's complaint satisfies the requirement that the actionable words be stated with particularity. *Itri v. Lewis,* 281 Pa.Super. 521, 422 A.2d 591 (1980). In determining whether the article is capable of a defamatory meaning, we therefore consider the entire contents of the article, including the headline. *Dunlap v. Philadelphia Newspapers, Inc., supra.* Our use of particular examples is not intended to imply that only those examples may be defamatory. Rather, we have considered the effect the entire article is fairly calculated to produce. *Corabi v. Curtis Publishing Co., supra.*

421 A.2d 826 (1980), overruled on other grounds, *Bond v. Gallen,* 292 Pa.Super. 207, 437 A.2d 7 (1981) (Citations omitted.)

At this procedural stage, any doubt must be resolved against the demurrer. *Vitteck v. Washington Broadcasting Co., supra.* Furthermore, the fact that the alleged defamatory statements are susceptible to an innocuous interpretation does not necessarily defeat the cause of action. *Corabi v. Curtis Publishing Company, supra; Brophy v. Philadelphia Newspapers Inc., supra.* When ruling on preliminary objections in the nature of a demurrer, the question is whether a nondefamatory interpretation is the *only* reasonable one. "... [U]nless the court is certain the communication is incapable of bearing a defamatory meaning a demurrer challenging the sufficiency of the complaint should be overruled." *Vitteck v. Washington Broadcasting Co., Inc.,* 256 Pa.Super. at 433, 389 A.2d at 1201. Applying these legal principles to the facts of this case, we find the order dismissing appellant's complaint to be in error.

The article describes appellant's animal auction and the continuing dissension between him and the Lehigh County Humane Society. (Schramm is shelter manager of the Society.) It includes an account of a 1977 raid on the auction by Society members, following which appellant was:

... charged with 150 counts of animal cruelty.

"We saw animals eating their own vomit. Most couldn't stand up in their cages," said Cindy O'Keefe, one of the society members on the 1977 raid. "There was blood in their stools and discharge running from their eyes and noses."

It also detailed a purchase of a cat made by Schramm as follows:

"I knew the cat was severely sick," said Schramm, "and I didn't want it to go somewhere where it would continue to suffer."

By the time the cat arrived in Allentown, said Schramm, "She was literally gasping for air, thrashing, crying and dying. I had no choice but to put her to sleep."

. . . . .

According to the preliminary autopsy report, the cat died of feline infectious peritonitis (FIP), a highly contagious, always fatal disease, according to Dr. Eugene Witiak, who performed the autopsy. "When we suspect FIP, we don't put the cats in the regular hospital," said Dr. Witiak. "We isolate them."

The final portion of the article links appellant to at least two dealers who sell animals to research labs and describes the following tests as examples of those for which the animals are used.

The most common test for toxicity is the Lethal Dose 50 in which 50 percent of the animals in a test group have to die in order to get a toxicity rating to satisfy federal requirements. Lipstick, for example, is fed to animals until half of them die, usually of stomach blockages or uremia, not of toxicity, said Marc Paulhus, an investigator with the U.S. humane society. Dr. Fox calls this test "psuedo-science."

The $14-billion-a-year cosmetics industry uses an estimated half-million rabbits a year for the Draize test in which a substance like hairspray is dripped into the eyeballs of live rabbits until they ulcerate or the rabbits go blind. The Draize test is used to test the eye irritancy of substances like soap, perfume and other common products.

■ Appellant concludes that the entire article, and especially these excerpts, accuse him of cruelty to animals, maintaining unhealthy conditions at his auction and selling the majority of the animals at the auction for testing and laboratory use similar to that described above. We agree that such a conclusion is not such "an unfair and forced construction on the interpretation of the publication", *Thomas Merton Center v. Rockwell International Corp.*,

497 Pa. 460, 467, 442 A.2d 213, 217 (1981), as to warrant sustaining appellees' preliminary objections.

Consider, for example, the publication of Schramm's statements concerning her purchase of the sick cat. This allegation was not presented as an isolated incident but was followed by a comment that one anonymous buyer "buys five to six dogs and cats a week at Gilbertsville, *treats the sick ones* and tries to find homes for them" (emphasis added) and an allegation from another buyer that ten per cent of the animals he purchases at Gilbertsville die. Certainly the reader could conclude from this that appellant sells seriously ill animals. That the article includes a statement that USDA reports certify no violations in appellant's operation does not necessarily dispel that conclusion, because the article further notes that USDA inspections did not take place on the day of the auction and that USDA inspectors are not veterinarians and thus will not give an opinion about an animal's health. *Cf., Morgan v. Bulletin Co.*, 369 Pa. 349, 85 A.2d 869 (1952) (inclusion of plaintiff's denial of bribery accusations does not provide "an easy escape from liability.")

Similarly, in regard to the portions of the article concerning the use of animals in research, a finding that the article is not defamatory because it includes appellant's statement that the majority of his buyers are not animal dealers, *see, Morgan v. Bulletin Co., supra*, and because it does not indicate that any testing or experimenting with animals was done at appellant's farm is an insufficient basis on which to dismiss appellant's complaint. The article does indeed link appellant to one animal dealer which was convicted of receiving stolen property, failure to keep records and failure to provide animals with shelter from the cold. This same dealer is further described as having sold dogs to a surgical supply firm which is alleged to have used and destroyed at least 900 dogs in a one-year period.[4] Certain-

---

4. The article appears to have been intended as one "linking the Gilbertsville animal auction to research labs" because the article notes that one animal dealer refused to be interviewed for that very reason.

ly, a reasonable reader could conclude that appellant is a link in the chain of supply of animals used in experiments at least similar, if not identical, to the ones described.

Finally, that the account of the 1977 raid was merely "a factual account of alleged wrongdoings ... more than five years ago" (Opinion at 7) is insufficient to remove liability. While such an account may be defended on the basis of qualified privilege, a jury could also find that the privilege was abused and the description would not therefore be shielded from liability. *See, Bausewine v. Norristown Herald*, 351 Pa. 634, 41 A.2d 736 (1945).

For these reasons, we agree with appellant that it was error for the court to dismiss his defamation complaint.

■ Appellant's complaint also included claims of invasion of privacy-false light and wrongful interference with business relationships. As to the latter, appellees' preliminary objections included a claim of privilege and an allegation that appellant's complaint failed to set forth any facts in support of the allegation that the Society and Schramm induced Faye to write the article, or to indicate what part or parts of the article portrayed appellant in an unfavorable light. Thus, three potential bases existed for dismissal of this count.

The order from which this appeal has been taken, while dismissing appellant's complaint in its entirety, did not, however, address any of the three objections raised with respect to count one. Rather, Judge Lowe discussed only the nondefamatory nature of the article. No mention was made of the claim of a privilege, or the insufficiency of count one's factual averments. Thus, it appears that in dismissing count one, Judge Lowe did not embrace any of the arguments raised by preliminary objection. As such, dismissal of the complaint in its entirety was procedurally unauthorized. We therefore must vacate the trial court's order insofar as it dismissed this count of the complaint and remand for further proceedings.

Since dismissal of the invasion of privacy-false light count was based solely on the issue of defamatory meaning, we must similarly vacate the trial court's dismissal of that count.[5]

Order vacated and case remanded for further proceedings not inconsistent with this opinion. Jurisdiction is relinquished.

---

5. Appellant had initially pleaded the additional ground that the article disclosed his gross earnings for 1977 and 1980. In light of the United States Supreme Court's decision in *Cox Broadcasting Corporation v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), appellant has abandoned this claim.