489 A.2d 1364

C. Ivan GORDON, D.O., Appellant,

v.

LANCASTER OSTEOPATHIC HOSPITAL ASSOCIATION, INC.; Professional Staff of Lancaster Osteopathic Hospital; Berel B. Arrow, D.O.; Norman M. Axelrod, D.O.; Joseph Gordon; G. Richard Hartz, D.O.; Seymour S. Kilstein, D.O.; Robert C. Scott, D.O.; and Lewis M. Yunginger, D.O., Deceased and his successor, Ethel M. Yunginger, Executrix, Appellees.

Superior Court of Pennsylvania.

Argued Aug. 23, 1984.

Filed Feb. 13, 1985.

Reargument Denied April 19, 1985.

Thomas B. Schmidt, III, Harrisburg, for appellant.

Thomas E. Brenner, Harrisburg, for Lancaster, appellees.

Jack M. Mumford, Harrisburg, for Arrow, appellee.

Michael M. Badowski, Harrisburg, for Hartz, appellee.

Before CIRILLO, OLSZEWSKI and BECK, JJ.

OLSZEWSKI, Judge:

This appeal follows an order sustaining appellees' preliminary objections in the nature of demurrers and dismissing counts 1 through 16, inclusive, of the complaint.[1]

Appellant, C. Ivan Gordon, D.O., practiced as a pathologist at the Lancaster Osteopathic Hospital ("LOH") from March of 1976 until October of 1980. From July 1, 1978 until June 30, 1980, appellant was employed by LOH; the terms of employment were defined by a written contract, renewable annually for a one year term.[2] On April 29, 1980 appellee Joseph Gordon, Executive Director of LOH, notified appellant of the hospital's intent not to renew the contract. On October 31, 1980, appellant delivered a letter of resignation to Dr. Gordon, effective as of that date.

This action arose as a consequence of a series of letters written by appellees Berel B. Arrow, D.O., Norman M. Axelrod, D.O., and G. Richard Hartz, D.O. to the Executive Director, the President of the Medical Staff and members of the Board of Directors of LOH in the early spring of 1980. These letters stated in pertinent part:

> [W]e are totally unhappy and would like to present a vote of no confidence in Dr. Ivan Gordon. We all feel that we lack trust in the reporting of Dr. Gordon. We feel that the Pathology Department should be stronger as the institution grows. At this point, we would not like to go

---

1. Count 17 was voluntarily discontinued by appellant. Appellant's brief at 1.

2. The contract was renewed for one year on September 25, 1979. Reproduced record at 70a.

into absolute detail, but just inform you of the above opinion.

Letter of February 14, 1980. Reproduced record at 72a. [T]he department concludes that because of the difficulty in communication and lack of confidence in Dr. Ivan Gordon's work, that we regretfully recommend to you that under no circumstances shall Dr. Ivan Gordon accede the chairmanship of the department of Pathology at the Lancaster Osteopathic Hospital, and we further feel that attempts at recruitment of a pathologist should be actively carried out by the institution.

Letter of March 7, 1980. Reproduced record at 73a.

On March 10, 1980 a letter from Dr. Hartz to the Executive Board stated: "A resolution of no confidence in the above individual was passed by a unanimous vote." Reproduced record at 74a. On October 10, 1980 a letter from Dr. Arrow to the Grievance and Ethics Committee stated: "... Dr. Gordon's attitude and performance over the past several years warrants our opinion. We still feel that a vote of 'no confidence' is indicated." Reproduced record at 83a.

Appellant alleges that these letters and other communications to the Executive Board were written in retaliation for his attempts to improve the quality of medical care provided by LOH. In the fall of 1979, appellant, as part of his duties as Chairman of the Professional Development Committee had gained approval of a plan to increase the number of specialists at LOH over a period of five years. Appellant charges that appellee-physicians resisted implementation of that plan based upon fears of increased competition among specialists at LOH. He further contends that appellee-physicians were fearful of and disturbed by his accurate and proper surgical tissue and autopsy reports which documented appellee-physicians' "improper medical procedures and the substandard care provided to their patients." Reproduced record at 14a.

Appellant's complaint levels seventeen charges including counts in libel and slander, intentional interference with employment, intentional interference with future economic

opportunities, wrongful termination, violation of common law and procedural due process, corporate negligence, intentional infliction of emotional distress, restraint of trade, civil conspiracy, and a claim for breach of contract. Following appellees' preliminary objections in the nature of demurrers, the court below dismissed all counts now before us. This appeal follows.

Appellant raises nine issues in this appeal. We address them seriatim. First, appellant argues that the lower court erred in finding the publications not defamatory as a matter of law. We hold that the communications were not capable of a defamatory meaning.

■ On appeal from an order sustaining preliminary objections in the nature of demurrers, this Court is concerned only with determining the legal sufficiency of appellant's complaint. *Schott v. Westinghouse Electric Corporation,* 436 Pa. 279, 259 A.2d 443 (1969). We must confine our analysis to the complaint and decide whether sufficient facts have been pleaded which would permit recovery if ultimately proven. *Id.; D'Antona v. Hampton Grinding Wheel,* 225 Pa.Super. 120, 310 A.2d 307 (1973).

■ We begin our analysis with recognition that a complaint alleging defamation should not be dismissed upon a preliminary objection in the nature of a demurrer unless the court is certain that the communication is incapable of bearing a defamatory meaning. *Vitteck v. Washington Broadcasting Co., Inc.,* 256 Pa.Super. 427, 389 A.2d 1197 (1978). The court, in making this determination, must accept as true all well-pleaded material facts alleged in the complaint, as well as all inferences reasonably deducible therefrom. *Id.* Under the circumstances of this case, we recognize that a communication is defamatory which "ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession." *Thomas Merton Center v. Rockwell International Corp.,* 497 Pa. 460, 463, 442 A.2d 213, 216 (1981), *cert. denied* 457 U.S. 1134, 102

S.Ct. 2961, 73 L.Ed.2d 1351 (1982), *quoting* Restatement (Second) of Torts § 573 (1977). The comment to section 573 elaborates:

> The imputation must be of such a character as to disparage the other in his business, trade, profession or office or tend to harm him in it.... When peculiar skill or ability is necessary, an imputation that attributes a lack of skill or ability tends to harm the other in his business or profession.

Restatement (Second) of Torts § 573, comment (c) (1977).

 If the court has any doubt that the communication is defamatory, then the issue must be given to the jury for them to determine whether the defamatory meaning was understood by the recipient. *Vitteck*, 256 Pa.Super. at 431, 389 A.2d at 1199. The court must be guided by consideration of the expertise and knowledge of those to whom the publication is circulated, and by consideration of the effect it is fairly calculated to produce. *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971). "The test is ... the impression it would naturally engender in the minds of the average persons ... among whom it is intended to circulate." *Id.*, 441 Pa. at 447, 273 A.2d at 907 (citation omitted). Here, those 'average persons' are appellant's fellow physicians and the professional community at LOH, particularly persons involved with personnel decisions. Even where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, the issue must proceed to the jury. *Zelik v. Daily News Publishing Co.*, 288 Pa.Super. 277, 431 A.2d 1046 (1981); *Brophy v. Philadelphia Newspapers, Inc.*, 281 Pa.Super. 588, 422 A.2d 625 (1980).

 We agree with the lower court which held that the words complained of by appellant bear no reasonable interpretation which would render them defamatory. The phrases "a vote of no confidence", "lack of trust in the reporting ability of [appellant]", "lack of confidence in [appellant's] work", and "[appellant's] attitude and performance over the past several years ... [indicates] ... a vote of 'no confi-

dence' ", if believed, do not impute a charge of incompetency or unfitness. *Compare Miller v. Hubbard*, 205 Pa.Super. 111, 207 A.2d 913 (1965) (letter describing transaction in which plaintiff was not involved *held* to state cause of action in defamation); *Agency Services, Inc. v. Reiter*, 513 F.Supp. 586 (E.D.Pa.1981) (letter imputing dishonesty); *Rannels v. S.E. Nichols, Inc.*, 591 F.2d 242 (3d Cir.1979) (words imputing fraud); *Altoona Clay Products v. Dun & Bradstreet*, 367 F.2d 625 (3d Cir.1966) (publication imputing insolvency).

■ We agree with the court below that, even under the assumption that appellees were possessed of the motives and malice towards appellant as alleged, the letters state no more than in the most general terms that appellees, speaking for their departments, lacked confidence in appellant's professional ability and could not recommend that his contract be renewed.[3] As stated by the lower court, appellees "cunningly or unwittingly stopped short of committing acts susceptible of defamatory meaning." Lower court opinion at 10.[4]

**3.** Appellees mistakenly assert that the communications were privileged, citing to the Peer Review Protection Act, Act of July 20, 1974, P.L. 564, No. 193. The lower court correctly found the defense of privilege inapplicable to the resolution of preliminary objections. Had the issue proceeded to trial, the court would have determined whether the privilege applied, and the jury would have determined whether the scope of the privilege were abused. *Burke v. Triangle Publications, Inc.*, 225 Pa.Super. 272, 302 A.2d 408 (1973).

**4.** Our holding today demands a more stringent burden of production by appellant than that adopted by the federal courts pursuant to Fed.R.Civ.P. 56(c).

It is often the case that although the basic facts are not in dispute, the parties in good faith may nevertheless disagree about the inferences to be drawn from these facts ... [or] ... what the intentions of the parties was as shown by the facts.... Under such circumstances the case is not one to be decided by the Trial Judge on a motion for summary judgment.

*S.J. Groves and Sons v. Ohio Turnpike Commission*, 315 F.2d 235 (6th Cir.1963) *cert. denied* 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963); *see also Rannels v. S.E. Nichols, Inc.*, 591 F.2d 242 (1979). We therefore reject the reasoning in *Moyer v. Mid-Penn Bank*, 48 Northumberland L.J. 182 (1976) (*held*, where defendant denies all aver-

We believe that the only reasonable interpretation of these letters is that they are expressions of opinions. Opinion without more is not actionable libel. *Bogash v. Elkins*, 405 Pa. 437, 176 A.2d 677 (1962); *see also* Restatement (Second) of Torts § 566 (1977) (a statement in the form of an opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion) adopted in *Braig v. Field Communications*, 310 Pa.Super. 569, 456 A.2d 1366 (1983). While the record shows that appellees specifically refused to elaborate on the basis of their opinion in response to a request from the Executive Board, we cannot say, as a matter of law, that the letters imply undisclosed defamatory facts.[5]

Further, our court has held that communications which may annoy or embarass a person are not sufficient as a matter of law to create an action in defamation. *Bogash; Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583 (1980); *Scott-Taylor, Inc. v. Stokes*, 425 Pa. 426, 229 A.2d 733 (1967) (plaintiff must have suffered that kind of harm which has grievously fractured his standing in the community). We must conclude, after review of the context, identity of the parties and the context of the communications that the letters were not defamatory.[6]

Appellant next argues that the lower court erred in holding that his claim in defamation against Joseph Gordon was insufficient as a matter of law. The letter complained of requested that appellant return books, keys and reimburse LOH for personal telephone calls. Reproduced record at 87a. Appellant argues that these requests suggest that he is a thief. In light of the analysis above, we

ments of libel, legal issues are raised per se which can only be determined fairly by trial of the case).

5. Reproduced record at 72a, 83a.

6. Appellant's allegations as to defamatory oral communications fail for want of specificity as to the content of the statements and as to the identity of the persons receiving the alleged communications. *See Raneri v. Depolo*, 65 Pa.Commw. 183, 441 A.2d 1373 (1982); *Gross v. United Engineers and Constructors, Inc.*, 224 Pa.Super. 233, 302 A.2d 370 (1973).

agree with the lower court that the letter bears no reasonable defamatory interpretation.

Appellant next alleges that the lower court erred in holding that his complaint in intentional interference with prospective contractual relations was insufficient as a matter of law. We agree.

Our courts have recognized that a cause of action may exist for interference with prospective contractual relations. *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971) *quoting* Restatement of Torts § 766.[7] *Glenn* delineated the elements of this tort which must be present to state a sufficient cause of action: the complaint must show a prospective contractual relation between appellant and LOH; the purpose or intent to harm appellant by preventing the relationship from occurring; the absence of privilege or justification on the part of appellees; the occurrence of actual harm or damage to appellant as a result of appellees' conduct. *Glenn*, 441 Pa. at 479–80, 272 A.2d at 898; *see also Adler, Barish, Daniels, Levin, etc. v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978) (adopting Restatement (Second) Torts § 766 (1977)).

In the instant case, the complaint alleges that, but for the communications to the Executive Board, appellant had every expectation of renewal of his contract. Reproduced record at 21a, 25a, 27a, 30a, 33a–34a, and 37a. The complaint further alleges that the communications were intended to harm appellant by preventing his renewal of contract with LOH.

 As to the absence of justification or privilege for the communications, appellant, in counts 2–5 of the complaint, has alleged that the letters were defamatory. While we today hold that the letters, as a matter of law, do not

7. Restatement of Torts § 766 states "... one who, without a privilege to do so, induces or otherwise purposely causes a third person not to ... (b) enter into or continue a business relationship with another is liable to the other for the harm caused thereby." *Id. See Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466 (1979); *Yaindl v. Ingersoll Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611 (1980).

sustain a cause of action in libel, we nevertheless believe that substantial questions have been raised which may at trial negate any asserted justification or privilege. Appellant argues that the letters were unjustified in that his work at all times was properly performed. Reproduced record at 13a. Appellant has raised a question of fact as to whether the letters were privileged, in light of the censor of appellees by the Medical Staff Executive Committee. Reproduced record at 16a. Further, appellant alleges that, under the Medical Staff Constitution and By-laws, "individual physicians at the department level do not have the responsibility or legal function to review the professional abilities of other professional staff members...." *Id.* These allegations raise questions as to the existence and scope of any privilege which must go to the jury as finder of fact. *Compare Burke v. Triangle Publications, Inc.,* 225 Pa.Super. 272, 302 A.2d 408 (1973) (issue whether alleged defamatory communication is within scope of privilege is question of fact). Finally, appellant has alleged lost wages as actual harm resulting from the interference. Therefore, while expressing no view as to the merits of the claim, we hold that preliminary objections as to counts 8–11 were improperly sustained.

 Appellant next alleges that the lower court erred in dismissing his claim for violation of procedural due process. We agree with the court below that none of appellant's rights of due process were violated. The employment contract provided for compulsory arbitration, of which appellant chose not to avail himself. That arbitration would have provided appellant with full due process protection.[8] Instead, appellant chose voluntarily to terminate his employment with LOH. *See Chowdhury v. Reading Hospital and Medical Center,* 520 F.Supp. 134 (E.D.Pa.1981), *rev'd on other grounds,* 677 F.2d 317 (3d Cir.1982).

8. By letter of April 29, 1980 LOH offered to meet with appellant under the "resolution of disputes" provision of his contract. Reproduced record at 75a.

Appellant next alleges that the lower court erred in dismissing his claim for violation of his right to continued employment at LOH. We agree with the court that, absent contractual or statutory provisions to the contrary, an employee has no legal recourse against his employer for dismissal unless the dismissal in some way offended a manifest public policy. *See Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974). We note that appellant's brief presents an argument based in public policy. We are not at liberty to consider that argument insofar as our review is limited to the content of the complaint. *Schott v. Westinghouse Electric Corporation*, 436 Pa. 279, 259 A.2d 443 (1969); *D'Antona v. Hampton Grinding Wheel*, 225 Pa.Super. 120, 310 A.2d 307 (1973).

Appellant next alleges that the lower court erred in dismissing his action in negligence against LOH for its failure to insure a fair procedure as required by its employment contract, the staff by-laws and state law. We hold that the count was properly dismissed. While we recognize that this count pleads a cause of action separate from appellant's claim under due process, appellant's failure to avail himself of proffered arbitration procedures persuades us that dismissal was correct.

Appellant next alleges that the lower court erred in dismissing his action for outrageous conduct and intentional infliction of emotional distress. We hold that the count was properly dismissed. Recovery for intentional infliction of emotional distress will be allowed where there is conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society". Restatement (Second) of Torts § 46, comment (d) (1977); *see Banyas v. Lower Bucks Hospital*, 293 Pa.Super. 122, 437 A.2d 1236 (1981) (altering medical records to impute criminal acts); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir.1979) (reckless diagnosis of fatal disease); *Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970) (mishandling of corpse). The

publication of letters of 'no confidence', as a matter of law, do not rise to this level of atrocity.

■ Appellant next alleges that the lower court erred in dismissing his action for conspiracy in restraint of trade. We agree with the court below that this count was properly dismissed. Appellant was free to seek employment at any other hospital or medically related institution following his termination of employment at LOH.

■ Finally, appellant alleges that the lower court erred in dismissing his actions for conspiracy to defame and conspiracy to interfere with contractual relations. In light of our holding that the letters were incapable of any reasonable defamatory meaning, the action as to conspiracy to defame must fall.

We reverse the order of the lower court dismissing count 7 of the complaint, alleging a conspiracy to interfere with contractual relations. For purposes of this analysis we incorporate our discussion, *supra*, of the appellant's cause of action in interference with prospective contractual relations.

> A civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by an unlawful means or for an unlawful purpose. A conspiracy becomes actionable when some overt act is done in pursuance of the common purpose or design held by the conspirators and actual damage results.

*Baker v. Rangos*, 229 Pa.Super. 333, 351, 324 A.2d 498 (1974) (citations omitted).

■ In the instant case, taking all facts pleaded in the complaint as true, appellant has alleged that the letters were written as the product of combined action of the physicians for the unlawful purpose of interfering with his prospective contractual relations. Appellant alleged $1,300,000 in actual damages. Therefore, sufficient facts have been alleged to allow count 7 of the complaint to proceed to trial. We cannot, at this point, accept appellees' theory that a conspiracy cannot occur in the context of the

'single entity' of a hospital and its medical staff. *See Keddie v. Pennsylvania State University*, 412 F.Supp. 1264 (M.D.Pa.1976); *see also Buckner, M.D. v. Lower Florida Keys Hospital District*, 403 So.2d 1025 (Fla.App.1981). In the instant case, appellant has alleged that appellees did not have the responsibility or legal function to review the professional abilities of other professional staff members under the medical staff constitution and by-laws. Reproduced record at 16a. This allegation persuades us that the issue must go to trial.[9]

In conclusion, the lower court's order as to counts 1–6, 12, and 13–16 is affirmed. The order as to counts 7–11 is reversed.

The order is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion. Jurisdiction is relinquished.

BECK, J., concurs in the result.

CIRILLO, J., files a concurring and dissenting opinion.

CIRILLO, Judge, concurring and dissenting:

I respectfully must disagree with the conclusion that the words contained in the letters of Drs. Arrow, Axelrod, Hartz, and Yunginger were incapable of a defamatory meaning. I would reinstate counts 1 through 5 of appellant's complaint sounding in defamation.

Defendant Arrow's letter stated, in part:

At an official meeting of the Department of Internal Medicine, it was a unanimous decision upon the following matter; we are totally unhappy and would like to present a vote of no confidence in Dr. Ivan Gordon.

We all feel that we lack trust in the reporting of Dr. Gordon. We feel that the Pathology Department should be stronger as the institution grows.

The first paragraph of defendant Axelrod's letter read:

9. We note that the lower court did not address the 'single entity' theory.

At the February meeting of the surgical staff the continual ongoing serious problem of the present junior pathologist was discussed in detail by my department. The department concludes that because of the difficulty of communication and the lack of confidence in Dr. Ivan Gordon's work, that [sic] we regretfully recommend to you that under no circumstances shall Dr. Ivan Gordon accede the [sic] chairmanship of the department of Pathology at the Lancaster Osteopathic Hospital, and we further feel that attempts at recruitment of a pathologist should be actively carried out by the institution.

Defendant Hartz's letter said: "At a department head meeting held Tuesday, March 4, 1980 we discussed the service provided by and the relationship with Dr. C. Ivan Gordon, Department of Pathology. A resolution of no confidence in the above individual was passed by a unanimous vote."

A fourth letter signed by defendants Arrow and Yorkinger also expressed "no confidence" in Gordon's "attitude" and "performance."

I should think that no citation of authority beyond that provided by the majority is necessary to demonstrate that these imputations are capable of a defamatory meaning. The majority states:

We begin our analysis with recognition that a complaint alleging defamation should not be dismissed upon a preliminary objection in the nature of a demurrer unless the court is certain that the communication is incapable of bearing a defamatory meaning. *Vitteck v. Washington Broadcasting Co., Inc.*, 256 Pa.Super. 427, 389 A.2d 1197 (1978). The court, in making this determination, must accept as true all well-pleaded material facts alleged in the complaint, as well as all inferences reasonably deducible therefrom. *Id.* Under the circumstances of this case, we recognize that a communication is defamatory which "ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession."

*Thomas Merton Center v. Rockwell International Corp.*, 497 Pa. 460, 463, 442 A.2d 213, 216 (1981), *cert. denied* 457 U.S. 1134 [102 S.Ct. 2961, 73 L.Ed.2d 1351] (1982), *quoting* Restatement (Second) of Torts § 573 (1977). The comment to section 573 elaborates:

> The imputation must be of such a character as to disparage the other in his business, trade, profession or office or tend to harm him in it.... When peculiar skill or ability is necessary, an imputation that attributes a lack of skill or ability tends to harm the other in his business or profession.

Restatement (Second) of Torts § 573, comment (c) (1977).

If the court has any doubt that the communication is defamatory, then the issue must be given to the jury for them to determine whether the defamatory meaning was understood by the recipient. *Vitteck,* 256 Pa.Super. at 431, 389 A.2d at 1199. The court must be guided by consideration of the expertise and knowledge of those to whom the publication is circulated, and by consideration of the effect it is fairly calculated to produce. *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971). "The test is ... the impression it would naturally engender in the minds of the average persons ... among whom it is intended to circulate." *Id.*, 441 Pa. at 447, 273 A.2d at 907 (citation omitted). Here, those 'average persons' are appellant's fellow physicians and the professional community at LOH, particularly persons involved with personnel decisions. Even where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, the issue must proceed to the jury. *Zelik v. Daily News Publishing Co.*, 288 Pa.Super. 277, 431 A.2d 1046 (1981); *Brophy v. Philadelphia Newspapers, Inc.*, 281 Pa.Super. 588, 422 A.2d 625 (1980).

At 261–262.

Without reading more into the letters than their plain wording imports, one could easily determine that: 1) Arrow's letter imputes that the internal medicine department

did not trust Gordon's capability to report pathology department findings, and felt that Gordon's continued presence would therefore be inconsistent with a strong pathology department; 2) Axelrod's letter implies that Gordon was unfit to be chairman of the pathology department because the department of surgery "lack[ed] ... confidence in Dr. Ivan Gordon's work"; 3) the other two letters indicate that the members of two medical departments at the hospital had no confidence in Gordon's "service" and "performance." Surely these expressions can be understood to imply that Dr. Gordon's actual work performance showed him to be unfit to practice his business or calling as a pathologist at the hospital and lacking in the professional competence required for the chairmanship of the pathology department. So understood, the words clearly bore the potential to impair Gordon's " 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or *confidence"* in which his colleagues and employers held him. *Zelik v. Daily News, supra,* 288 Pa.Super. at 281, 431 A.2d at 1049, *quoting Vitteck, supra,* 256 Pa.Super. at 432, 389 A.2d at 1200 (quoting W. Prosser, *Handbook of the Law of Torts* § 111, at 739 (4th ed. 1971)) (emphasis mine). In fact, Gordon alleges that the words had exactly such a damaging effect on his professional reputation, with the ultimate result that the Lancaster Osteopathic Hospital refused to renew his contract.

The majority holds that the "only reasonable interpretation of these letters is that they are expressions of opinion." At 263. Expressions of opinion, however, can support an action for libel if they imply defamatory allegations of fact. *Braig v. Field Communications,* 310 Pa.Super. 569, 456 A.2d 1366 (1983); *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1981); Restatement (Second) of Torts § 566 (1977); *cf. Rybas v. Wapner,* 311 Pa.Super. 50, 457 A.2d 108 (1983) (not actionable to characterize plaintiff as "anti-Semitic" in letter to his attorney). Even if the only reasonable way to interpret the defendants' letters is as expressions of opinion, I think it obvious that the particular expressions

used can be read reasonably to imply defamatory allegations of fact, namely Dr. Gordon's unreliable performance as a pathologist and deficiency in the objective qualifications needed in the position of department chairman.

Moreover, under any interpretation the letters do not consist entirely of opinion; they profess to report as *fact* that the collective members of various medical departments passed votes of no confidence in Dr. Gordon. The Doctor alleges that the letters were false, and accordingly we must treat this "fact" recited in the letters as false.

The allegedly defamatory words used in the letters are virtually indistinguishable from those found actionable in *Miller v. Hubbard*, 205 Pa.Super. 111, 207 A.2d 913 (1965), where an insurance claims adjuster wrote a letter saying that based on the adjuster's past experience with a contractor he had "no confidence" in the contractor's opinion about the cause of damage to a building. Obviously such well-chosen "expressions of opinion" tend to imply that they are based on defamatory facts, and can seriously damage a person's business reputation if believed.[1]

The following quote from *Miller* is apropos to the majority's observation that Arrow, Axelrod, Hartz, and Yunginger "cunningly or unwittingly stopped short of committing acts susceptible of defamatory meaning" (at 262, *quoting* trial ct. op.):

> To render a defamatory statement actionable, it is not necessary that the charge be made in a direct, positive and open manner. If the words used, when taken in their ordinary acceptation, convey a degrading imputation, no matter how indirectly, they are libelous, and it matters

[1]. I find unpersuasive any attempt to distinguish *Miller* on the ground that there the contractor was not involved in the transaction referred to in the defamatory letter. The letter defamed Miller by imputing that his unreliability on *past* occasions warranted a lack of confidence. In any event, the issue in a defamation action is not whether the plaintiff was somehow "involved" in the transaction underlying the defamatory communication, but whether the communication itself is false and defamatory.

not how artfully their meaning is concealed or disguised. 33 Am.Jur. (Libel and Slander) Sec. 9, page 43.

205 Pa.Super. at 115, 207 A.2d at 916.

The mere susceptibility of a statement to an innocuous interpretation does not defeat a cause of action in libel. *Raffensberger v. Moran*, 336 Pa.Super. 97, 485 A.2d 447 (1984); *Agriss v. Roadway Express, Inc.*, 334 Pa.Super. 295, 483 A.2d 456 (1984). Especially in ruling on preliminary objections in the nature of a demurrer, the court should not decide that words are nondefamatory as a matter of law unless it is certain that a nondefamatory meaning is the *only* reasonable interpretation to be given to the words. *Zartman v. Lehigh County Humane Society*, 333 Pa.Super. 245, 482 A.2d 266 (1984).

I cannot agree that the only rational interpretation of the defendants' letters is to view them as innocuous and nondefamatory expressions of opinion. Giving appellant the benefit of reasonable inferences from well-pleaded facts to which he is entitled on appeal from a demurrer, *see Douglas v. Schwenk*, 330 Pa.Super. 392, 479 A.2d 608 (1984), I find the letters to be *capable* of a defamatory meaning.

I deem it appropriate to consider, however, whether the trial court's dismissal of counts 1–5 of the complaint might be sustained on the basis of privilege. Each defendant, in preliminary objections, raised the defense of privilege under the Peer Review Protection Act of July 20, 1974, P.L. 564, No. 193, § 3, 63 P.S. § 425.3. The court declined to rule on the issue of privilege, finding it inappropriate for resolution on preliminary objections. Appellees Arrow and Hartz do not pursue the claim of privilege on appeal; the remaining appellees advert to the theory of privilege enunciated in *DeLuca v. Reader*, 227 Pa.Super. 392, 323 A.2d 309 (1974) (allocatur denied), a theory not specifically presented to the trial court. Principles of waiver, however, cannot preclude us from affirming dismissal of the defamation counts on the ground that appellees' letters were privileged. It is well settled that we may affirm the trial court's decision if the result is correct on any legal ground, without regard to the

grounds relied on by the trial court. *E.J. McAleer & Co., Inc. v. Iceland Products, Inc.*, 475 Pa. 610, 381 A.2d 441 (1977); *Perri v. Broad Street Hospital,* 330 Pa.Super. 50, 478 A.2d 1344 (1984).

There are basically two classes of privilege which may defeat liability in an action for defamation: conditional privilege and absolute privilege.

A conditional, qualified privilege extends to defamatory communications made upon a proper occasion, from a proper motive, and based on reasonable or probable cause. *Biggans v. Foglietta,* 403 Pa. 510, 170 A.2d 345 (1961). The constitutional privilege stemming from the First Amendment is a type of conditional privilege since it may be lost if the publisher acts with actual malice.

> *But see Hepps v. Philadelphia Newspapers, Inc.,* 506 Pa. 304, 485 A.2d 374 (1984) (under United States Supreme Court interpretations of constitutional privilege, common law conditional privileges "have lost their significance") (dictum).

One who publishes within the scope of an *absolute* privilege is immune from liability even though he acts from an improper motive, with actual malice, and without reasonable or probable cause. *Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963). A publisher acting under an absolute privilege loses its protection only if he exceeds its scope by publishing to unauthorized parties. *See Agriss v. Roadway Express, supra.*

> "[A]bsolute privileges" are based chiefly upon a recognition of the necessity that certain persons, because of their special position or status, should be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests. *To accomplish this, it is necessary for them to be protected not only from civil liability but also from the danger of even an unsuccessful civil action. To this end, it is necessary that the propriety of their conduct not be inquired into indirectly by either court or jury in civil proceedings brought against them for miscon-*

*duct in their position.* Therefore the privilege, or immunity, is absolute and the protection that it affords is complete. It is not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the actor. Restatement (Second) of Torts, Ch. 25, at 243 (emphasis added). For an enumeration of the absolute privileges generally recognized, *see id.* §§ 583–592A.

It is a question of law whether privilege applies in a given case, but a question of fact for the jury whether a privilege has been abused. *Montgomery v. City of Philadelphia,* 392 Pa. 178, 140 A.2d 100 (1958).

When the legal question of privilege is interlaced with factual questions concerning its abuse, the issue of privilege generally cannot be resolved as a matter of law. The defense of conditional privilege in particular nearly always calls for factual determinations about the defendant's motives and mental state in publishing a defamation. We have thus held that privilege to defame is an affirmative defense which may not be decided on preliminary objections, but must be raised as "new matter" in the defendant's answer. *Barber v. Lynch,* 275 Pa.Super. 333, 418 A.2d 749 (1980); *see* Pa.R.C.P. 1030.

However, as we have just seen the policy behind absolute privilege is to preclude not only liability for defamation, but also the risk and expense of defending suit. Restatement, *supra; see also Montgomery v. Philadelphia, supra.* Accordingly, the question of absolute privilege may be raised and decided on preliminary objections where the defendant's entitlement to an absolute privilege appears on the face of the complaint so as to preclude the plaintiff's right of action as a matter of law. *See, e.g., Smith v. Griffiths,* 327 Pa.Super. 418, 476 A.2d 22 (1984). *Accord Greenberg v. Aetna Insurance Co.,* 427 Pa. 511, 235 A.2d 576 (1967), *cert. denied,* 392 U.S. 907, 88 S.Ct. 2063, 20 L.Ed.2d 1366 (1968); *DeSantis v. Swigart,* 296 Pa.Super. 283, 442 A.2d 770 (1982); *cf. Burke v. Triangle Publications, Inc.,* 225 Pa.Super. 272, 302 A.2d 408 (1973) (allocatur denied) (quali-

fied, constitutional privilege not properly raised in preliminary objections).

With those principles in mind, we should examine the privileges of arguable application to the present context, to determine whether any such privilege would furnish grounds for sustaining appellees' objections as a matter of law.

The Peer Review Protection Act confers immunity in the following terms:

(a) Notwithstanding any other provision of law, no person providing information to any review organization shall be held, by reason of having provided such information, to have violated any criminal law, or to be civilly liable under any law, unless:

(1) such information is unrelated to the performance of the duties and functions of such review organization, or

(2) such information is false and the person providing such information knew, or had reason to believe, that such information was false.

63 P.S. § 425.3(a). "Review organization" as defined by the Act clearly would include the officers of Lancaster Osteopathic Hospital to whom appellees disseminated their letters. *See id.* § 425.2. The privilege provided by the Act is therefore of primary relevance to this case; it is, however, a conditional privilege which is lost if the person participating in peer review knowingly disseminates false information.

Dr. Gordon alleges that the information contained in appellees' letters was false and that appellees knew it to be false. If so, peer review immunity would be lost by virtue of section 425.3(a)(2). Consequently, the Act does not provide grounds for upholding the judgment rendered for appellees on preliminary objections.

The only species of absolute privilege appellees can point to as possibly immunizing their action is the privilege pronounced in *DeLuca v. Reader, supra,* protecting certain communications between employers and employees arising in the context of a labor dispute. Appellees' letters to the

officers of Lancaster Osteopathic Hospital communicated information in the context of what might be characterized as a "labor dispute" concerning Dr. Gordon. However, even a superficial analysis demonstrates that appellees cannot claim absolute privilege under the rationale of *DeLuca*.

In *DeLuca* this Court considered national and state policies favoring private resolution of disputes between employers, employees, and unions, and held that

> [N]otices of dismissal for cause which are contemplated by a collective bargaining agreement and which are published by the employer only to those with a legitimate interest in the subject matter may not be made the subject of an action in libel, regardless of whether the allegations of cause are true or false and regardless of the actual motive behind the dismissal.

227 Pa.Super. at 399–400, 323 A.2d at 313, *quoting Joftes v. Kaufman*, 324 F.Supp. 660, 662 (D.D.C.1971) (quoting *General Motors Corp. v. Mendicki*, 367 F.2d 66, 71 (10th Cir.1966)). In *Agriss v. Roadway Express, supra,* we extended the *DeLuca* privilege by logical implication to employee warning notices contemplated by a collective bargaining agreement.

Crucial to the *DeLuca-Agriss* privilege is not the mere fact that libelous communications have occurred in the context of a labor dispute, but that the communications be transmitted in notices specifically authorized by a collective bargaining agreement between an employer and a union. Thus, if a libel is engendered by utilization of the regular procedures mandated under a collective bargaining agreement, important considerations of labor policy dictate that the dispute be resolved under the agreement and not by resort to the state courts.

Outside the class of cases represented by *DeLuca* and *Agriss,* this State does not recognize an absolute privilege to defame in the context of a labor dispute. Indeed, the type of privilege generally applicable to labor-related defamation actions is conditional, and is closely related to the constitutional privilege protecting the First Amendment

right to free speech. *See Old Dominion Branch No. 496, National Assn. of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Raffensberger v. Moran, supra; see also Wilson v. Benjamin,* 332 Pa.Super. 211, 481 A.2d 328 (1984); *see generally* Annots., 60 A.L. R.3d 1041, 1080 (1974).

Thus, even were we to find, by analogy, a "labor dispute" between Dr. Gordon and his peers at the hospital, we could not fashion an absolute privilege that would entitle appellees to judgment on this appeal. I therefore dissent from the decision to affirm dismissal of counts 1 through 5 of the complaint.[2]

---

**2.** Additionally, I dissent from affirmance of the dismissal of count 14, and would reinstate that claim. Count 14 alleges, in paragraph 161, that appellant's termination from employment violated public policy. Neither the trial court nor the majority has addressed appellant's public policy argument on the merits, and yet both courts have inexplicably denied the claim. I find that the legal merit of the public policy argument cannot be determined on the present state of the record, and would remand on count 14 for further proceedings. I concur in the majority's judgment insofar as it reverses dismissal of counts 7–11 of the complaint alleging interference with contractual relations; and insofar as it affirms dismissal of counts 6, 12–13, and 15–16 of the complaint.