**Avery v. African American Museum in Philadelphia**

*Stephen R. Bolden,* for appellant.

*Tracy A. Walsh, Wendi D. Barish* and *Jamie N. Labukas,* for appellees.

RIZZO, *J.*, July 30, 2010—The appellant, Joel Avery, appeals from the court's order and decision of May 5, 2010 denying the appellant's motion for post-trial relief.

## FACTS AND PROCEDURAL HISTORY

The appellant commenced this action on March 8, 2008. The appellees filed a motion for summary judgment on July 6, 2009 which was denied on September 11, 2009. A jury trial commenced on January 7, 2010 and ended on January 19, 2010, On January 19, 2010 the jury rendered a verdict for the appellees-defendants.

Following the jury verdict, the appellant filed a timely motion for post-trial relief on January 21, 2010, requesting judgment notwithstanding the verdict and a new trial. This court heard oral argument on the post-trial motion on April 16, 2010. On May 10, 2010 the post-trial motion for judgment n.o.v. and a new trial was denied. The appellant then filed a timely notice of appeal on May 17, 2010. The appellant filed a timely statement of matters complained of on June 3, 2010 pursuant to Pa.R.A.P. 1925(b).[1]

The facts of the case are as follows:

In October 2005 Joel Avery, a public relations consultant, entered into a contract with Romona Benson, CEO of the African American Museum in Philadelphia. (N.T. 1/7/10 at 11-15.) Mr. Avery provided public relations services to the African American Museum in Philadelphia including promotion and media coverage. *Id.* at 18-21. The contract between the museum and Mr. Avery was

---

1. The statement of matters complained of is attached as exhibit 1.

for a period of two years, between October 2005 and October 2007. *Id.* at 15.

In April of 2007, prior to the end of the two-year contract, Mr. Avery met with Ms. Benson to discuss a pay increase. (N.T. 1/8/10 at 9.) Ms. Benson agreed to give Mr. Avery a five hundred dollar a month pay increase, subject to budget approval from the board of the museum. *Id.* In July 2007, Ms. Benson informed Mr. Avery that there was not enough money in the budget to give him an increase. (N.T. 1/12/10 at 18-19.)

Following the news that there would be no increase in payment for Mr. Avery, Ms. Benson and Mr. Avery engaged in substantial e-mail correspondence between August 15, 2007 and August 17, 2007. On August 15, 2007 Mr. Avery e-mailed Ms. Benson to confirm that they would proceed with the same payment and level of services as the prior contract, which would not include a pay increase. (N.T. 1/8/10 at 9.) In response, Ms. Benson sent an e-mail to Mr. Avery on August 16, 2007, explaining that she would get back to Mr. Avery regarding the agreement. *Id.* The following day, August 17, 2007, Mr. Avery e-mailed Ms. Benson to suggest potential ways of obtaining the money needed to pay for the increase in salary, including using money from the mayor's cultural bond, which granted the museum $3,000,000. *Id.* Ms. Benson responded the same day via e-mail, indicating that the bond he was referring to was earmarked for specific purposes, specifically the grant was for a capital purpose, and could not be used for paying Mr. Avery. *Id.*

On August 20, 2007, Mr. Avery attended a publicity event for the museum at Comcast Studios. *Id.* at 11. Mr. Avery's appearance was a surprise to Ms. Benson, be-

cause she had communicated to him that it was not necessary for him to meet her there. *Id.* Mr. Avery, accompanied by his girlfriend, showed up at the event in attire that Ms. Benson found unprofessional and inappropriate. *Id.* at 12. After the event, Mr. Avery walked Ms. Benson to her car, where he again confronted her about obtaining a raise. *Id.* at 12-13. Ms. Benson felt "uncomfortable" during the conversation with Mr. Avery because he repeatedly asked about the raise, whether Ms. Benson was meeting with another public relations firm, and whether Ms. Benson could pay him out of funds from the previously mentioned bond. *Id.* at 51-52. Ms. Benson grew increasingly uncomfortable during the confrontation as a result of Mr. Avery's questions and his physical proximity to her. *Id.* at 53. He continued to edge closer to her, making her feel intimidated. *Id.*

On August 21, 2007, Mr. Avery forwarded the collection of e-mails between himself and Ms. Benson dealing with the terms of his requested pay increase to six members of the board of the museum, without Ms. Benson's consent or prior knowledge. *Id.* at 61-62. The six members of the board who received the e-mails were Tom Muldoon, Bill Wilson, Ernie Jones, Cheryl McClenny-Brooker, Lisa Crutchfield, and Claire Lomax. (N.T. 1/12/10 at 30.) Tom Muldoon, a member of the board of the museum who had received the e-mails from Mr. Avery, sent the e-mails to Wanda Paul, the executive of Philadelphia Convention and Visitors Bureau. (N.T. 1/8/10 at 41-42.)

Later that week, on August 24, 2007, Ms. Benson had dinner with two close friends, Wanda Paul and Swanie Goldsmith. *Id.* at 13-14. At the dinner, Ms. Benson said she had been under a lot of stress that week and men-

tioned Mr. Avery's name. *Id.* at 14. Ms. Paul, senior vice president at the Philadelphia Convention and Visitors Bureau, said she had received a blind copy of an exchange of e-mails between Ms. Benson and Mr. Avery. *Id.* at 14-15. When Ms. Benson asked who sent her the e-mails, Ms. Paul said that she preferred not to disclose that information. *Id.* at 15. Ms. Benson believed that Mr. Avery had sent the collection of e-mails to Ms. Paul and she was bothered that he circulated the e-mails without her permission. *Id.* at 55.

In response to the confrontation and discovery that their e-mail correspondence had been sent outside of the museum community, Ms. Benson contacted the chairman of the executive board of the museum, Ernie Jones. (N.T. 1/8/10 at 49.) Upon Mr. Jones' recommendation, Ms. Benson brought up her concerns about Mr. Avery with the executive committee of the board on August 27, 2007, including Ernest Jones, Claire Lomax, Jacquelyn Manns Smalley, Bryan Freeman, Calvin Bland, Lisa Crutchfield, Anthony McIntosh, Cheryl McClenney-Brooker, and Barbara Potts. *Id.* Ms. Benson testified that she would consult with the executive board of the museum when she encountered extraordinary issues or sometimes for advice. *Id.* Considering this an extraordinary situation, Ms. Benson sought the counsel of the executive board prior to Mr. Avery's termination. *Id.* at 49-50.

Following Ms. Benson's discussion with the executive board, she sent Mr. Avery a letter on August 27, 2007 to inform him that his contract would be terminated. In that letter, Ms. Benson wrote, in part:

"This letter is to inform you of the termination of your agreement with the African American Museum in Philadelphia as public relations consultant. It is unfortunate

that we were unable to come to a reasonable agreement for renewal of services. Your recent correspondence in pursuit of a contract renewal and additional fees, and your choice to blind copy countless others outside of the museum constituted a serious breach of professional ethics. Therefore, we have made the decision to not continue the relationship." [2]

In addition sending the letter to Mr. Avery, Ms. Benson carbon copied the letter to nine members of the executive board of the museum. (Plaintiff's brief in support of plaintiff's motion for post-trial relief, 7.) Among the nine members of the executive board receiving a carbon copy of the letter were Ernie Jones, Cheryl McClenny-Brooker, Lisa Crutchfield, and Claire Lomax, recipients of the forwarded e-mails from Mr. Avery. Ms. Benson chose to carbon copy the nine members of the executive board of the museum on the letter, because she had discussed Mr. Avery's service and behavior with them during a conference call that morning. (N.T. 1/8/10 at 31.)

A significant number of witnesses from the local non-profit and tourism community were presented. In large part, the testimony presented by both parties described Mr. Avery's work in a positive light.[3] Over the course of

2. A. copy of the letter in its entirety is attached as exhibit 2. The only text of the letter alleged by appellant to be defamatory is as follows:

"your choice to blind copy countless others outside of the museum constituted a serious breach of professional ethics." (Plaintiff's complaint, 9, 13.)

3. Calvin Bland, one of the nine members of the executive committee of the museum that received the August 27 letter testified as fellows:

"Q: Sir, my question is: If you had been consulted at the time that they were considering retaining Mr. Avery, what, if anything, would you have offered?

"A: He did good work. I was always impressed with his products." (N/T 1/15/2010 at 17-18.)

the trial, the appellees presented a large body of testimony that the August 27 letter would not impact Mr. Avery's ability to get work in his noted field.[4] Although Ms. Benson was displeased with Mr. Avery's behavior described in the August 27 letter, she continued to believe that he had been successful in his job as a public relations consultant. She testified that Mr. Avery "did a very good job for us and we were satisfied with his work." (N.T. 1/7/10 at 21.) Ms. Benson's August 27 letter described the failure to come to a reasonable agreement for renewal of services as "unfortunate." *Exhibit 3.*

The appellant brought a defamation claim against the appellees on March 8, 2008. The case was tried before a 12-person jury from January 7, 2010 through January 19, 2010. During the course of the trial, testimony was presented by both parties regarding the meaning of the statement in the August 27, 2007 letter, in the form of four expert witnesses and over 30 lay witnesses. (Defendant's response in opposition to plaintiff's brief in support of plaintiff's motion for post-trial relief, 7.)

Prior to charging the jury, the trial court informed jurors that if the jury had a question for the court, the jury should continue deliberations instead of waiting for

4. See testimony of Romona Benson (N.T. 1/8/10 at 124); testimony of Ernest Jones (N.T. 1/15/10 at 39); testimony of Tom Muldoon (N.T. 1/8/10 at 36) (stating that, prior to lawsuit, his opinion of Mr. Avery did not change); The appellees presented witnesses, including Calvin Bland, Ernest Jones, Barbara Potts, and Claire Lomax, who testified that the August 27, 2007 letter did not negatively affect their perception of Mr. Avery. (N/T 1/15/2010 at 17-18); (N/T 1/15/2010 at 39); (N/T 1/13/2010 at 172); (N/T 1/13/2010 at 204).

Bruce Crawley testified that Mr. Avery's business could be impacted by filing a lawsuit against the museum. (N.T. 1/11/10 at 49-50.)

a response from the court. (N.T. 1/19/10 at 201.) On January 19, 2010, the jury exited the courtroom to begin deliberations at 2:57 p.m. *Id.* at 204. The jury requested a re-reading of the definition of "defamation" and a copy of the letter from Ms. Benson. *Id.* at 207. At 4:33 p.m. the jury reentered the courtroom to have the definition re-read. *Id.* Following the reading, the jury exited the courtroom at 4:38 p.m. for further deliberations where they had the opportunity to review the August 27 letter marked as exhibit 2. *Id.* at 212. At 4:49 p.m. the jury re-entered the courtroom to give its verdict for appellees. *Id.* at 213.

In charging the jury, the court used a verdict sheet that included eight questions.[5] Question one, at issue, is as follows:

"Question 1: Do you find that the August 27, 2007 letter sent by defendant Romona Riscoe Benson to plaintiff Joel Avery contained a defamatory statement?"

In response to question one, the jury answered "no," indicating that the letter sent by Ms. Benson did not contain a defamatory statement. (N.T. 1/19/10 at 214.) Due to the negative response on question one on the verdict sheet, no further questions needed to be addressed by the jury. *Id.*

### ISSUES ON APPEAL

Pursuant to the Pennsylvania Rules of Appellate Procedure and order of this court, the appellant served on the court and counsel for the appellees, a statement of

---

5. The verdict sheet is attached as exhibit 3.

matters complained of on appeal.[6] They are summarized as follows:

"(1) The only evidence available to the jury conclusively established the letter sent by defendant Romona Riscoe Benson to plaintiff Joel Avery on August 27, 2007 contained a defamatory statement which was understood by the recipients of the letter as defamatory.

"(2) The instant trial court committed an abuse of discretion or error of law in failing to direct a verdict in favor of plaintiff on question 1 on the jury verdict sheet.

"(3) The instant trial court erred in failing to order a new trial where the jury disregarded the court's instruction to engage in careful and thorough deliberations and instead rushed to judgment on question 1 on the jury verdict sheet."

## LEGAL DISCUSSION

### I. *The Substantial Amount of Evidence Presented to the Jury Did Not Conclusively Establish That the August 27 Letter Contained a Defamatory Statement*

Appellant takes issue with the language in the August 27 letter sent by Ms. Benson that states "your choice to blind copy countless others outside of the museum constituted a serious breach of professional ethics." (Plaintiff's complaint at 9, 13.) The appellant contends that the evidence presented to the jury established, without a doubt, that the letter written by Ms. Benson was defamatory on its face and understood by its recipients as defamatory. Both parties presented significant evidence regarding the meaning of the subject statement and such

---

6. The statement of matters complained of is attached as exhibit 1.

evidence did not conclusively establish that the statement was defamatory.

During the course of the nine-day trial, testimony was presented by both parties about the meaning of the statement in the August 27, 2007 letter, in the form of four expert witnesses and over 30 lay witnesses. (Defendant's response in opposition to plaintiff's brief in support of plaintiff's motion for post-trial relief, 7.) The appellant and appellees presented conflicting testimony about whether the portion of the letter at issue was defamatory in nature.[7] With conflicting evidence about the nature of the statement, the proper evaluation of evidence rested with the jury.

As the fact-finder, the jury's role includes examining the credibility of all witnesses and determining the weight that should be given to all of the evidence. The jury "is free to accept or reject the credibility of both expert and lay witnesses, and to believe all, part or none of the evidence." *Nemirovsky v. Nemirovsky,* 776 A.2d 988, 993 (Pa. Super. 2001). Conflicting testimony alone is not sufficient grounds to grant a new trial. *Id.* (citing *Martin v. Evans,* 551 Pa. 496, 711 A.2d 458, 461 (1998); *Baldino v. Castagna,* 505 Pa. 239, 249, 478 A.2d 807, 812

---

7. The appellant presented testimony from witnesses who indicated that the August 27, 2007 letter would negatively impact Mr. Avery's ability to acquire further work in the local public relations industry. See N/T 1/11/2010 at 39-40 (describing Bruce Crawley's testimony); N/T 1/11/2010 at 40-41 (detailing testimony from Acel Moore). The appellees presented witnesses, including Calvin Bland, Ernest Jones, Barbara Potts, and Claire Lomax, who testified that the August 27, 2007 letter did not negatively affect their perception of Mr. Avery's abilities as a public relations consultant. (N/T 1/15/2010 at 17-18); (N/T 1/15/2010 at 39); (N/T 1/13/2010 at 172); (N/T 1/13/2010 at 204).

(1984). This court instructed the jury about conflicting testimony using the suggested standard civil jury charge, which states that "If . . . you decide that there is a genuine and irreconcilable conflict of testimony, it is your function and duty to determine which, if any, of the contradictory statements you will believe." (N.T. 1/19/10 at 169) (citing Pa. SSJI (Civ) 5.04). The jury in the instant case was guided by the court's instruction in evaluating conflicting evidence and giving it whatever credit it deserved. The jury found that the evidence did not establish a case for the appellant.

In addition to failing to demonstrate that the evidence conclusively established there was a defamatory statement, the appellant also failed to show that the verdict was against the weight of the evidence. When evaluating a claim that the verdict is against the weight of the evidence, Pennsylvania applies a "shocks-the-conscience" test. *Commonwealth v. United States Mineral Products Company,* 598 Pa. 331, 341, 956 A.2d 967, 973 (2008). Under this test, a new trial will only be granted on the basis of a weight of evidence claim if the "evidence supporting the verdict is so inherently improbable or at variance with admitted or proven facts or with ordinary experience as to render the verdict shocking to the court's sense of justice." *Wagner v. Anzon Inc.,* 453 Pa. Super. 619, 636, 684 A.2d 570, 578 (1996).

The appellant failed to establish that the subject portion of the August 27, 2007 letter sent by Ms. Benson contained a defamatory statement. Conflicting evidence was presented by both parties regarding the defamatory nature of the statement, and the verdict was not against the weight of the evidence.

II. *The Subject Statement in the August 27, 2007 Letter Did Not Constitute Defamation Per Se and a Directed Verdict in That Regard Was Not Warranted*

The subject statement in the August 27 letter was not defamatory per se. Substantial evidence presented by both parties demonstrated that the statement could have more than one meaning. Additionally, language similar to that in the August 27 letter was found not to be defamatory in prior case law. Determination as to whether the August 27 letter contained a defamatory statement rested properly with the jury, and the trial court's decision not to decide as a matter of law that the statement was defamatory did not deprive appellant of his ability to prove as such to the jury.

### A. Defining Defamation and Defamation Per Se Through Statutes and Cases

The burden on the plaintiff for demonstrating an action for defamation is codified under 42 Pa.C.S. §8343(a). Under this statute, the plaintiff must demonstrate the following to prove a claim for defamation:

"(1) The defamatory character of the communication.

"(2) Its publication by the defendant,

"(3) Its application to the plaintiff.

"(4) The understanding by the recipient of its defamatory meaning.

"(5) The understanding by the recipient of it as intended to be applied to the plaintiff

"(6) Special harm resulting to the plaintiff from its publication.

"(7) Abuse of a conditionally privileged occasion." 42 Pa.C.S. §8343(a).

In a claim for defamation, the defendant has the burden to prove:

"(1) The truth of the defamatory communication.

"(2) The privileged character of the occasion on which it was published.

"(3) The character of the subject matter of defamatory comment as of public concern." 42 Pa.C.S. §8343(b).

The court must determine, in the first instance, whether the statement complained of is capable of defamatory meaning. *Corabi v. Curtis Publishing Company,* 441 Pa. 432, 442, 273 A.2d 899, 903 (1971). (citations omitted) When determining if the statement is capable of defamatory meaning, "[i]f the court has any doubt that the communication is defamatory, then the issue must be given to the jury for them to determine whether the defamatory meaning was understood by the recipient." *Gordon v. Lancaster Osteopathic Hospital Association,* 340 Pa. Super. 253, 269, 270, 489 A.2d 1364, 1368, 1373 (1985) (citing *Vitteck v. Washington Broadcasting Company Inc.,* 256 Pa. Super. 427, 389 A.2d 1197 (1978)). If there is more than one interpretation of whether the statement was defamatory "it is for the jury to determine if the defamatory meaning was understood by the recipient." *Pelagatti v. Cohen,* 370 Pa. Super. 422, 439, 536 A.2d 1337, 1345 (1987) (citing *Gordon v. Lancaster Osteopathic Hospital Association,* 340 Pa. Super. 253, 489 A.2d 1364, 1368 (1985). Also, if a statement is capable of an innocent meaning, then it should be viewed as a jury question to determine the meaning of the statement. *Dougherty v. Boyertown Times,* 377 Pa. Super. 462, 472, 547 A.2d 778, 783 (1988).

The appellant asserts that the portion of the August 27, 2007 letter at issue was defamatory per se. (Plaintiff's brief in support of plaintiff's motion for post-trial relief, 7.) Statements that are defamatory per se impute "to the plaintiff a criminal offense, punishable by imprisonment, or conduct incompatible with the plaintiffs business." *Brinich v. Jencka,* 757 A.2d 388, 397 (2000) (citing Restatement (Second) of Torts, §570(c)). Conduct incompatible with the plaintiff's business is further described as "conduct, character, or a condition that would adversely affect his fitness for the proper conduct of his business, trade, or profession." *Pelagatti v. Cohen,* 370 Pa. Super. 422, 438-39, 536 A.2d 1337, 1345 (2000).

When a statement is found to be defamatory per se, the plaintiff is not required to prove special harm, such as pecuniary loss. *Brinich v. Jencka,* 757 A.2d 388, 397 (Pa. Super. 2000). Instead of being required to demonstrate special harm, "a defendant who publishes a statement which can be considered slander per se is liable for the proven, actual harm the publication causes." *Walker v. Grand Central Sanitation Inc.,* 430 Pa. Super. 236, 250, 634 A.2d 237, 250 (1993).

In two similar cases where employment contracts were not renewed, the courts did not find defamation per se. Both cases stemmed from allegedly defamatory language, similar to that of the August 27 letter, and both courts held that this type of language was not capable of defamatory meaning,

In *Gordon v. Lancaster Osteopathic Hospital Association,* the plaintiff alleged that letters of no confidence written by several department heads were defamatory. *Gordon v. Lancaster Osteopathic Hospital Association,* 340 Pa. Super. 253, 489 A.2d 1364, 1368, 1373 (1985).

There, the defendants wrote a letter stating that "[W]e are totally unhappy and would like to present a vote of no confidence in Dr. Ivan Gordon. We all feel that we lack trust in the reporting of Dr. Gordon." *Id.* at 1367. Another letter written by defendants indicated they had "difficulty in communication and lack of confidence in Dr. Ivan Gordon's work." *Id.* The court examined the Restatement of Torts §573 describing defamation per se with regard to business conduct. *Id.* at 1368. The court made note of Comment C of section 573, which states:

"The imputation must be of such a character as to disparage the other in his business, trade, profession or office or tend to harm him in it . . . . When peculiar skill or ability is necessary, an imputation that attributes a lack of skill or ability tends to harm the other in his business or profession." Restatement (Second) of Torts §573, comment (c) (1977).

In order to examine the imputation of a statement, the court is guided by "consideration of the expertise and knowledge of those to whom the publication is circulated, and by consideration of the effect it is fairly calculated to produce." *Id.* (citing *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971)). The test applied is "the impression it would naturally engender in the minds of the average persons . . . among whom it' is intended to circulate." *Id.* (quoting *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971)).

In a second analogous case, a professor whose two-year contract was not renewed based upon letters from faculty and staff regarding his performance sued the college for defamation. *Baker v. Lafayette College,* 350 Pa. Super, 68, 71, 504 A.2d 247, 248 (1986). In four

total letters, two were found by the court to be privileged and two were found to contain statements that were not capable of defamatory meaning. *Id.* at 74-79, 604 A.2d at 250-252. The two letters that were found not to be capable of defamatory meaning were highly critical of the plaintiff's lack of interest and enthusiasm and allowing the presence of his wife in the classroom during class sessions. *Id.* The letters complained of described the plaintiff's attitude as "almost cavalier in his dealings with the students," and stated he was "less successful at meeting . . . requirements" than other employees. *Id.* at 77-78, 604 A.2d at 252. There, the court held that the statements were not capable of defamatory meaning. *Id.* at 79, 604 A.2d at 253. Instead, the court characterized the statements as opinions and called the tone of the statements "mild." *Id.* at 79, 604 A.2d at 252-53. In addition, the court considered the audience of the letter when determining if it was capable of defamatory meaning. *Id.* at 80, 604 A.2d at 253. The audience of the letter was only college officials involved in renewing the contract of the plaintiff. *Id.*

### b. The Subject Language of the August 27 Letter Did Not Give Rise to a Finding of Defamation Per Se

The statement in the August 27 letter did not fall under the category of defamation per se. The evidence presented about the meaning of the letter and the prior case law demonstrate that a finding of defamation per se was not proper in the instant case. The jury was the proper fact-finder.

The appellant in the instant case claims that the statement made by Ms. Benson is defamatory per se because it accused him of conduct which is incompatible with

the proper conduct in the hospitality industry in Phila-delphia. (Brief in support of plaintiff's motion for post-trial relief, 7.) Given similar statements made in *Gordon* and *Baker* that were found not to be capable of defama-tory meaning, the portion of the August 27, 2007 letter at issue was not defamatory per se.

The context of the letter from Ms. Benson is similar to that of the statements in *Gordon* and *Baker.* In both cases, the statements were made by the defendants when determining whether to renew a contract with the plain-tiffs. As in the present case, the circulation of the alleg-edly defamatory statement in *Gordon* was to people within the company. *Id. Gordon v. Lancaster Osteo-pathic Hospital Association,* 340 Pa. Super. 253, 261, 489 A.2d 1354, 1368 (1985) In *Gordon,* the Court found that statements by other doctors indicating their lack of trust in the plaintiff's work and declining work perfor-mance did "not impute a charge of incompetency or unfitness" but were instead opinions. *Id. Baker* also dealt with allegedly defamatory language that was circulated internally. *Baker v. Lafayette College,* 350 Pa. Super. 68, 70, 504 A.2d 247, 248 (1986). There, the court considered the audience of the statement before determining that it was not capable of defamatory meaning. *Id.* at 79-80, 504 A.2d at 252-53.

In the present case, Ms, Benson sent the letter at issue to inform Mr. Avery about the termination of his contract. She also sent the letter to nine members of the executive board of directors of the museum with whom she had consulted about the matter earlier that morning. Ms. Benson occasionally consulted the executive board about extraordinary issues, and she considered the termination of the museum's public relations consultant to be an

extraordinary issue. As in both *Gordon* and *Baker,* the letter in the instant case was sent internally, *only* to members of the executive board of directors of the museum. The termination of a contract with the museum's public relations consultant was well within the purview of Ms. Benson and the executive director, Mr. Jones, to seek input from the executive committee members. As stewards of the museum, the executive committee and its members are duty bound to make decisions in the best interest of the museum and guide it in difficult situations.

Ms. Benson sent a termination letter to the public relations consultant for the museum and included members of the executive board as recipients. Four of the members who received the letter had also received from Mr. Avery his e-mail correspondence with Ms. Benson. When considering the audience of the statement, as required by the court in *Baker,* the August 27 letter sent by Ms. Benson was not defamatory per se. This was an internal matter and only members of the museum received the letter.

Another issue that created doubt about the defamatory meaning of the subject language of the letter was the conflicting evidence the appellant and appellees presented regarding the meaning of the statements.[8] With four expert witnesses and over 30 lay witnesses, both parties presented significant testimony about the meaning of the statement in the August 27 letter. (Defendant's response in opposition to plaintiff's brief in support of plaintiff's motion for post-trial relief, 7.) Witnesses included leaders and participants in the hospitality industry, non-profit and museum community of Philadelphia. Given the substantial amount of evidence presented by

8. See supra note 7.

both parties, the appellant failed to establish that the subject language of the letter was defamatory per se.

Both parties, however, presented similar testimony about the work performance of Mr. Avery. The appellant and appellees demonstrated that Mr. Avery was talented as a public relations consultant. Particularly, Ms. Benson, the author of the August 27 letter, testified that Mr. Avery "did a very good job for us and we were satisfied with his work." (N.T. 1/7/10 at 21.) Ms. Benson also testified that Mr. Avery helped transform the museum's public image from a fiscally distressed institution and landed dozens of major cover stories, headline stories and feature stories in the press about the museum. *Id.* at 20-21. The August 27 letter itself described the failure to reach an agreement regarding Mr. Avery's pay as "unfortunate." Exhibit 2. These statements praised Mr. Avery's work and in effect expressed dismay that the employer-employee contract could not be salvaged. This was a simple case of wage dispute and nothing more.

With conflicting evidence regarding the meaning of Ms. Benson's letter, the appellant did not establish that the letter imputed to Mr. Avery "conduct incompatible with [his] business." *Brinich v. Jencka,* 757 A.2d 388, 397 (Pa. Super. 2000) (citing Restatement (Second) of Torts, §570(c)). Thus, the appellant did not establish that the subject language of the letter was defamatory per se, and the jury was the proper fact-finder to determine whether or not it was defamatory.

With more than one possible meaning of the letter at issue, the proper fact-finder was the jury. See *Pelagatti v. Cohen,* 370 Pa. Super. 422, 438-39, 536 A.2d 1337, 1345 (2000) (detailing importance of jury as fact-finder

when more than one meaning of allegedly defamatory statement exists); *Gordon v. Lancaster Osteopathic Hospital Association,* 340 Pa. Super. 253, 261, 489 A.2d 1364, 1368 (1985) (explaining if doubt exists regarding meaning of defamatory statement, issue must be decided by jury). With conflicting evidence, the jury is able to "accept or reject the credibility of both expert and lay witnesses, and to believe all, part or none of the evidence." *Nemirovsky v. Nemirovsky,* 776 A.2d 988, 993 (Pa. Super. 2001). This court should not have taken away the fact-finding role of the jury by allowing the August 27 statement to be classified as defamation per se. The issue of whether the August 27, 2007 letter was defamatory was well within the purview of the jury. After careful deliberations, the jury determined that the statement was not defamatory.

III. *The Trial Court Did Not Abuse Its Discretion in Failing to Order a New Trial; Jury Deliberations Were Careful and Thorough.*

The appellant asserts that the jury disregarded this court's instruction to deliberate for the purpose of arriving at a fair verdict. (Brief in support of plaintiff's motion for post-trial relief, 26-28.) The appellant claims that the jury only deliberated for three minutes, between 4:38 p.m. and 4:41 p.m. *Id.* at 28. The appellant's version of the timeline, however, does not correctly reflect the amount of time the jury deliberated. Prior to deliberations, this court instructed the jury to continue deliberating even if a note was sent to the court about any matter. (N.T. 1/19/10 at 201.) Specifically, this court instructed the jury:

"if a note comes to the court about any matter, [a response] will not necessarily be instant, because if some issues deal with some aspect of law in the case or evidence in the case, I, as the court, confer with counsel. So we have to assemble them, get some response, and then get a message formally back to you . . . That said, continue your deliberations. Do not wait for a response back from the court. Not to worry, we will get back to you." *Id.*

Following this court's charge, the jury left the courtroom for deliberations at 2:57 p.m. (N.T. 1/19/10 at 204.) Sometime thereafter, the jury requested a re-reading of the definition of defamation and a copy of the letter from Ms. Benson. *Id.* at 207. At 4:33 p.m. the jury re-entered the courtroom to have the definition re-read. *Id.* The jury left the courtroom at 4:38 p.m. for deliberations with the subject letter, exhibit 2, and returned at 4:49 p.m. with a verdict. *Id.* at 212-13. Thus, the jury had between 2:57 p.m. and 4:33 p.m. to deliberate before returning to deliberate at 4:38 p.m. This gave the jury approximately an hour and a half to deliberate.

A jury verdict may be set aside if the jury disregarded the instructions of the court. *Morris v. Peckyno,* 202 Pa. Super. 490, 492, 198 A.2d 396, 398 (1964). In the present case, the jury had the opportunity to deliberate for approximately an hour and a half, following the court's instructions to continue deliberations even if they had inquiries pending. There was no disregard of the court's instruction, and therefore a new trial was not granted on this ground.

In support of this court's decision not to grant a new trial based on the length of jury deliberations is a case where a jury began deliberations at 4:50 p.m. on a Friday

before a long weekend and reached a verdict within an hour. *DiFeliceantonio v. Pecora Corporation,* 30 Phila. 548, 554, 28 D.&C.4th 200, 207 (1996). There, the court held that the jury deliberations were sufficient. *Id.* The court held that "the fact that the jury reached its conclusion within an hour is no indication that it failed to deliberate sufficiently long or to consider the evidence." *Id.* Similarly, the jury in the present case had over an hour and one-half hours to deliberate and reach a verdict.

The appellant cites *Chestnut v. The Hill School,* 34 Phila. 100 (1997) in support of his motion for a new trial based on the lack of careful and thorough jury deliberations. In *Chestnut,* the jury left the courtroom to deliberate at 4:07 p.m. and returned at 4:10 p.m. with a question. *Id.* Upon receiving an answer to their question, the jury left to continue deliberations and reached a verdict at 4:16 p.m. for punitive damages in the amount $10,000,000. *Id.* The present case can be distinguished from *Chestnut,* because jurors were able to deliberate from 2:57 p.m. to 4:33 p.m., prior to returning to the courtroom for the definition of "defamation" be re-read. As the court instructed, jurors were to continue deliberations even if they were waiting for an answer from the court. The jury in *Chestnut* awarded $10,000,000 after deliberating for only 10 minutes, while the jury in the instant case deliberated for over one and one-half hours and returned a verdict after following the instruction of the court.

The jury in the instant case did not disregard the instructions of this court. They deliberated for an appropriate amount of time before reaching a verdict. *DiFeliceantonio v. Pecora Corporation,* 30 Phila. 548, 554,

28 D.&C.4th 200, 207 (1996) (holding jury reaching decision within one hour did not mean jury did not have sufficient time to consider and weigh evidence.)

## CONCLUSION

Based on the aforementioned, the instant trial court properly denied the appellant's motion for post-trial relief. Wherefore, the instant trial court's ruling was proper and should be affirmed.

---

## EXHIBIT 1

*Statement of Matters Complained of on Appeal
Pursuant to Pa.R.A.P. Rule 1925(b)*

(1) The only evidence available to the jury conclusively established the letter sent by defendant Romona Riscoe Benson to plaintiff Joel Avery on August 27, 2007 contained a defamatory statement which was understood by the recipients of the letter as defamatory.

(2) The court committed an abuse of discretion or error of law in failing to direct a verdict in favor of plaintiff on question 1 on the jury verdict sheet, which asked the jurors to determine if the August 27, 2007 letter sent by defendant Romona Riscoe Benson to plaintiff Joel Avery contained a defamatory remark understood to be so by the recipients thereof.

(3) The court abused its discretion in failing to order a new trial where the jury disregarded the court's instructions to engage in careful and thorough deliberations and instead rushed to judgment on question 1 on the jury

verdict sheet since the evidence available to it conclusively established the letter contained a defamatory statement, understood to be so by the recipients thereof.

## Certificate of Service

I, Stephen R. Bolden, Esquire, hereby certify that on June 3, 2010, I caused a true and correct copy of the foregoing plaintiff's statement of matters complained of on appeal to be electronically filed with this court. Same was served the following via first class mail on June 3, 2010:

Wendi D. Barish, Esquire
Weber Gallagher Simpson
Stapleton Fires & Newby [,LP
2000 Market Street, 13th Floor
Philadelphia, PA 19103

FELL & SPALDING

/s/Stephen R. Bolden, Esquire
Stephen R. Bolden, Esquire

# EXHIBIT 2

August 27, 2007

Joel Avery
P-O- Box-35082
Philadelphia, PA 19120

Dear Mr. Avery

This letter is to inform you of the termination of your agreement with the African American Museum in Philadelphia as Public Relations Consultant. It is unfortunate that we were unable to come to a reasonable agreement for renewal of services. Your recent correspondence in pursuit of a contract renewal and additional fees, and your choice to blind copy countless others outside of the Museum constituted a serious breach of professional ethics. Therefore, we have made the decision to not continue the relationship.

By September 7, 2007, please turn over any materials that are the property of the Museum. Also, refer any press inquiries to Liz Kent in the President's Offices. Your final check will be issued after that time.

Romona Riscoe Benson
President & CEO

Cc:    Ernest Jones, Esq.
       M. Claire Lomax, Esq
       Jacquelyn Manns Smalley
       Bryan Freeman
       Calvin M. Bland
       Lisa Crutchfield
       Anthony McIntosh
       Cheryl McClenney-Brooker
       Barbara M Potts, Esq. – Blank Rome, LLP
                         General Counsel

Sent via registered mail

701 ARCH STREET
PHILADELPHIA, PA 19106
(215) 574-0380
FAX (215) 574-3110
www.AAMPmuseum org

EXHIBIT 3

(4) Do you find that the false and defamatory communication in the letter dated August 27, 2007 was published by the defendants intentionally with knowledge that it was false?

Yes _____ No _____

If your answer is "Yes", go directly to question 7. If your answer is "No", go to question 5.

(5) Do you find that the false and defamatory communication in the letter dated August 27, 2007 was published by the defendants recklessly, with disregard for whether it was true or false or entertaining serious doubt about the truth of the communication?

Yes _____ No _____

If your answer was "Yes", you should proceed to question 7. If your answer is "No", go to question 6.

(6) Do you find that the false and defamatory communication in the letter dated August 27, 2007 was published by the defendants negligently with an absence of ordinary care and diligence in ascertaining the true facts?

Yes _____ No _____

If your answer is "Yes", go to question 7. If your answer is "No", plaintiff cannot recover and you should not answer any further questions and should return to the courtroom.

(7) Do you find that the plaintiff has suffered harm as a result of the publication of a false and defamatory communication by the defendants?

Yes _____ No _____

If your answer is "Yes" go to question 8. If your answer is "No", the plaintiff cannot recover and you should not answer any further questions and should return to the courtroom.

(8) State the amount of damages you find that the defendants should pay to the plaintiff as a result of the defamation.